Thomas LANKA, D.D.S., and Gordon L. Wright, D.D.S., as Co-Trustees of the Plans and Trusts known as Thomas Lanka, D.D.S., Gordon L. Wright, D.D.S., P.C., Employees' Pension Plan and Trust and Employees' Profit Sharing Plan and Trust, Plaintiffs,

v.

Michael B. O'HIGGINS, Defendant.

No. 88–CV–922.

United States District Court,
N.D. New York.

Nov. 6, 1992.

Higgins, Roberts, Beyerl & Coan, P.C., Schenectady, NY (William P. Willig, of counsel), for plaintiff.

Thorn and Gershon, Albany, NY (Arthur H. Thorn, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

### Background

SCULLIN, District Judge.

The plaintiffs commenced this action on August 30, 1988, seeking $250,000 in damages plus interest, costs and attorney's fees from the defendant,[1] alleging that he, while employed as their sole "investment manager," violated the applicable ERISA and investment industry standards and breached his duties of loyalty, diversification and prudence. They alleged specifically that he breached his duties in that he:

1) failed to follow the plaintiffs' specific instructions to invest in a conservative, diversified portfolio;

2) allowed plaintiffs' complete portfolio to be invested in just three different stocks in the year 1986;

3) failed to diversify the plaintiffs' portfolio pursuant to 29 U.S.C. § 1104;

4) subjected plaintiffs' pension and profit sharing plans to imprudent and unreasonable losses under the existing market conditions; and

5) generally invested without care, skill or prudence in an undiversified portfolio.

Complaint at ¶ 12.

The defendant contends that he did not violate any ERISA provisions, that he utilized a proper investment philosophy and

---

**1.** At the conclusion of the trial, the plaintiffs' counsel moved to amend the complaint to reflect the testimony at trial. He moved to amend the complaint to reflect a $70,000 increase in the damages alleged to have been sustained by the plaintiffs, bringing the total damages to $320,000. Additionally, counsel wished to set the amount of interest on those damages at $172,800. The defendant's counsel opposed this application, alleging that despite the demand in the original complaint, the pretrial submissions had provided no basis for the proof regarding damages at trial. In particular, defendant's counsel alleged that in the plaintiffs' list of witnesses, while the identity of their expert had been disclosed, the articulation of the substance of his anticipated testimony did not include anything relative to damages. The court reserved decision at that time on the motion. In light of the decision that follows, this motion is moot.

made investment decisions utilizing all skill, care, prudence and diligence as required of him under the prevailing circumstances. He further alleges that the damages suffered by the plaintiffs were not as a result of his conduct, since he counselled the plaintiffs against moving the investments of which they complain and they nevertheless transferred their investment accounts, sold off the stocks and realized a loss.

A three day non-jury trial was held before this court on September 29 through October 1, 1992. At this trial, the plaintiffs called the following witnesses: Dr. John Thomas Lanka; Mrs. Leonore Lanka; Mr. Robert Matt; Dr. Gordon L. Wright; Ms. Sylvia Anapolis; Mrs. Terry Hunsinger; Mrs. Loretta C. Maurer; Mr. Michael B. O'Higgins; Mr. Dominick J. Izzo; Mr. Christopher M. Briggs; Mr. Daniel Steinberg; and pursuant to stipulation between the parties, the deposition of Mrs. Helen Cary was read into the record since she was unavailable to testify. The defendant testified on his own behalf and called Mr. Simon John Aman as his only additional witness.

Prior to the commencement of the trial, the parties stipulated in writing to the following statement of facts, which was introduced in evidence at the trial as Court's Exhibit No. 1:

1) that the plaintiffs, Thomas Lanka, D.D.S. and Gordon L. Wright, D.D.S., are co-trustees and administrators of the pension and profit sharing plans and trusts, which were established on December 1, 1972, as amended on December 1, 1984;

2) that Thomas Lanka, D.D.S. and Gordon L. Wright, D.D.S. reside in the County of Schenectady and State of New York; that the defendant resides in the County of Albany and State of New York;

3) that the plans are duly qualified plans pursuant to the Internal Revenue Code, Section 401;

4) that on August 18, 1983, the plaintiffs retained the Defendant for the management of the plaintiffs' Employees' Pension and Profit Sharing Plans and Trusts;

5) that the Investment Management Agreement dated August 18, 1993 gave Michael B. O'Higgins sole, complete and discretionary management and control of the portfolios of both plans in such a manner as he deemed advisable; that the defendant was also given a limited power of attorney by plaintiffs at that time;

6) that for services rendered, the plaintiffs agreed to pay the defendant, in advance, a quarterly fee of ¼% of the value of the assets under his management at the beginning of each quarter; that all fees due the defendant have been paid in full;

7) that in conjunction with this portfolio, Dr. Lanka executed a custodial account agreement with the Bank of New York on August 2, 1983, which instructed the Bank to proceed with instructions from the defendant in regard to any investment decisions or cash movements in the portfolio accounts;

8) that the investments of the plans were never transferred by the defendant or his staff into the "Big Cap 90" fund;

9) that on October 31, 1986, Dr. Lanka terminated the defendant in his position as the sole investment manager of the plan portfolios' assets;

10) that the plaintiffs were provided with quarterly review statements from the defendant from October, 1983 through October, 1986;

11) that the plaintiffs relieved the defendant of his duties as investment manager of the plan portfolios on October 31, 1986 and assumed responsibility and custody of the plan stock portfolios at that time. Orally, at the commencement of the trial, the parties stipulated to the following additional facts:

12) that the defendant was an "investment manager" and fiduciary under the applicable law; and

13) that the portfolio was concentrated and not diversified.

Based upon these stipulations of fact, upon the documentary evidence introduced and upon credible testimony presented during the trial, the following findings of fact and conclusions of law are made.

*Findings of Fact*

Sometime in 1981 or 1982, Mr. Dominick Izzo, a stockbroker and institutional advisor then with Spencer Trask & Co. and a personal friend, upon inquiry from Dr. Thomas Lanka, recommended a number of investment managers, including the defendant, who could manage the pension and profit sharing plans for the professional corporation.

In late 1982,[2] the defendant met with Dr. and Mrs. Lanka at their home. Prior to the meeting, the defendant had provided them with various materials for their review. These materials included the defendant's brochure (Plaintiffs' Exhibit No. 2), an article entitled "He competes with the stockbrokers" published in the April 25, 1982 issue of the Albany Times Union (Plaintiffs' Exhibit No. 5), various correspondence (Plaintiffs' Exhibit Nos. 7a, 7b, 7e, 7f, 7g & 7h), the defendant's market bulletin dated February 25, 1982 (Plaintiffs' Exhibit No. 7c) and defendant's report entitled "Historical Performance Data" dated June 1982 (Plaintiffs' Exhibit No. 7d).[3] At this meeting, they discussed the defendant's investment philosophy; he made a presentation using charts, explaining that he employed a unified approach for his clients, investing their money in primarily Dow Jones "blue chip" stocks. The defendant explained that his goal was not to lose money. Dr. Lanka explained to the defendant that he wanted to retire at age 60; his birth date being May 13, 1936, he was then 46 years old. No mention was made of any of the other plan participants.

At some point prior to retaining the defendant, the Lankas were advised that the defendant was to be a guest on "Wall Street Week with Louis Rukeyser." (Plaintiffs' Exhibit No. 7g) They watched the program. They also interviewed other investment managers prior to deciding to retain the defendant.

By agreement executed on August 18, 1983 (Plaintiffs' Exhibit No. 7i), the plaintiffs retained the defendant as their investment manager for their pension and profit sharing plans. That agreement provides in pertinent part:

"You [referring to the defendant] will assume complete and discretionary management of this portfolio in such a manner as you deem advisable. . . .

For your services I [referring to Thomas Lanka, D.D.S.] agree to pay, in advance, a quarterly fee of ¼% of the value of the assets under management at the beginning of each quarter. . . ."

The agreement further provided that:

"This agreement may be cancelled by me [referring to Dr. Lanka] at any time, simply by notifying you [referring to the defendant] in writing and cancelling the limited power of attorney. . . ."

At the same time this "Investment Management Agreement" was signed, the defendant received a limited power of attorney. These documents were executed in the Lankas's home. At that time, the defendant again assured the Lankas that he could meet their investment objectives and work with them in an efficient manner.

On August 31, 1983, the funds were transferred as follows:

| | |
|---|---|
| Profit Sharing Plan | $192,542.59 |
| Pension Plan | 128,114.04 |

---

**2.** Dr. Lanka testified that he believed the meeting was held sometime in late 1982 or early 1983. Mrs. Lanka testified that the meeting occurred in 1982. The parties stipulated that it occurred in 1982; no specific date has been provided.

**3.** While there was a stipulation that all of these materials were received by Dr. and Mrs. Lanka prior to their 1982 meeting with the defendant, some of the documents are dated well into 1983. Thus, if the meeting did indeed occur during 1982, they could not have previewed those documents. However, since the contract for services was not executed until August 18, 1983, the Lankas would have had the opportunity to review those documents that post-dated their original meeting with the defendant prior to engaging him as their plans' investment manager.

Although none of these documents expressly used the term "contrarian" or "contrarian investment philosophy," they did describe the defendant's philosophy of buying stocks which were at or near their all-time lows and holding them to sell them for a profit.

(Plaintiffs' Exhibit Nos. 11 & 13). Thus, at the time transferred plans consisted of a total of $320,656.63 in cash.[4]

During the remainder of 1983 and 1984, the plaintiffs contributed $25,634 in additional funds to the pension plan and $40,913 to the profit sharing plan. (Plaintiffs' Exhibit Nos. 20a & 20b) For the years 1985 and 1986, the plaintiffs made contributions to plans other than those managed by the defendant, specifically by Merrill Lynch and by Payne Webber; Dr. Lanka also made a $10,000 investment in an Ellis Hospital bond on behalf of the plan in 1984.

Although there is some disagreement as to meetings that took place at the dental offices of Drs. Lanka & Wright,[5] it appears that sometime in August of 1984, the defendant met with Drs. Lanka and Wright (the plans' co-trustees), with Ms. Lois McGinn, Mrs. Terry Hunsinger, Ms. Helen M. Cary and Ms. Sylvia Anapolis (the employee/plan participants) in their dental offices. He was invited there to discuss the plans and report on their performance. He brought with him and used for his presentation various charts and reports including anticipated performance and market projections. In response to inquiries from Dr. Lanka and from at least one of the employee/plan participants, he explained his "contrarian" philosophy of investment, explaining that he bought what other people do not, in an attempt to buy low and sell high, thereby making the investment grow. Ms. Anapolis, Mrs. Hunsinger and Dr. Wright all characterized this as an "introductory"/"get acquainted" meeting since only Dr. Lanka had met the defendant; neither Dr. Wright nor any of the other plan participants had met him. According to Dr. Wright, there were no complaints voiced about the performance of the portfolio at this meeting. The testimony is consistent that there was no directive expressed to the defendant at this meeting that he diversify the portfolio more so than it was at that point.

Thereafter, Dr. and Mrs. Lanka met the defendant and possibly his account administrator, Mr. Christopher Briggs, at the Howard Johnson's restaurant sometime in late 1984 or early 1985.[6] They were concerned with the performance of the portfolio and expressed their disappointment inasmuch as the value of the portfolio was down. They expressed their concern to the defendant, explaining that they expected growth in the plans. The defendant was again aided by charts and graphs and demonstrated to them that stocks were the more appropriate investment at that time as opposed to bonds. They expressed their desire to diversify the portfolio.[7] The defendant told them that he would do that when the time was right; a time frame or dollar value of the portfolio was not mentioned so as to indicate when the diversification was to begin or to be completed. According to the defendant, they left the meeting satisfied with his presentation.

Another meeting with the doctors and their staff/plan participants was held sometime in April of 1985. This meeting came in response to a quarterly report which disclosed that the plans were not performing as expected and the plaintiffs and their employees covered by the plan were "concerned." Mr. Christopher Briggs accompanied the defendant to this meeting, although the defendant was the primary presenter. He again used charts, reports

---

4. While Dr. Lanka testified that the plans transferred included both cash and bonds, the bank statements for the custodian accounts reflect that only cash was transferred. That fact comports with the defendant's testimony.

5. There was disagreement here in that the defendant recalled that he only had one meeting at the plaintiffs' office. Mr. Briggs recalled that there were two such meetings, both occurring in 1985. The weightier testimony is that there were two meetings, one each in 1984 and 1985.

6. The date of this meeting cannot be determined with any degree of certitude because of the divergent testimony of the various witnesses. Dr. and Mrs. Lanka testified to two meetings at the Howard Johnson's restaurant, one occurring in 1984 and one in 1985. The defendant recalled only one, occurring in 1985. Mr. Briggs made no mention of either meeting in his testimony.

7. At this time, the portfolio was invested in INCO, a steel stock, International Harvester and three or four other stocks.

and market projections for the four stocks then in the portfolio: INCO, Bethlehem Steel, Navistar and MCI. He told them of the cyclical nature of the market, explaining that it was expected to rebound. It was at this meeting that Ms. Anapolis testified she questioned this investment plan and reportedly received a response from the defendant to the effect of "And how many stocks have you invested in!?" as a result of which she became silent in her disapproval.

Apparently, it was also at this meeting that Dr. Lanka raised the so-called Big Cap 90 plan. Dr. Lanka testified that he learned of this plan from his friend Dominick Izzo, who had heard of it from the defendant's partner, Mr. George Chillius.[8] The plan was hypothetical in nature—a "selection method," as Mr. Briggs characterized it—consisting of a computerized, totally non-subjective selection of 30 stocks from a list of 90 blue chip stocks. Selection was based upon stocks that had been underperforming and were moving up in value. It was a more conservative, more diversified investment program than their current investment program. The defendant advised the group that the plan was devised primarily for large, institutional investors but would be available to them if they wanted. He also told them that he did not think that the Big Cap 90 plan was right for them, but would move their portfolio into it when he felt the time was right. Although the persons present at this meeting testified that they had the impression at the conclusion of that meeting that the defendant intended to make the transition into the Big Cap 90 "soon," they were given no express time frame nor dollar value or indication of what their portfolio had to reach before the transition would take place. He did indicate to them that he would make the transition as soon as the time was right/when it was appropriate; he told them that the market was not right at that time to make the conversion.

During the rest of 1985, Dr. Lanka, who testified to being the lead trustee for the plans, spoke to Mr. Briggs via telephone on the average of once every six to eight weeks. Mr. Briggs made repeated assurances that there would be an explosion in the stocks contained within the portfolio, that things would turn around. He assured Dr. Lanka that the transition to Big Cap 90 would be accomplished when the time was right.

In the Spring of 1986, the portfolio improved; indeed, the portfolio was at its all time high. As a result of the quarterly report indicating its improvement as well as upon the advice of Mr. Izzo,[9] Dr. Lanka again spoke to Mr. Briggs and inquired if this was not a good time to transfer the portfolio's assets into the Big Cap 90 plan. Mr. Briggs told him that he would bring the matter to the attention of the defendant and would let him know.

When Dr. Lanka received no response from the defendant or Mr. Briggs within the next four to six weeks, he again called. Mr. Briggs said that he had spoken to the defendant, who wanted to wait. Dr. Lanka apparently continued to defer to the defendant's judgment. Dr. Lanka testified that he knew that the defendant was aware of his desires that the transition to the Big Cap 90 plan be accomplished "yesterday."

Dr. Lanka again spoke to Mr. Briggs after receiving the June 30, 1986 quarterly report indicating that the portfolios had "collapsed." He testified that he was angry and wanted to know why the conversion to Big Cap 90 had not been done. Mr. Briggs explained that the defendant felt

---

**8.** Here, again, the testimony is in some conflict. Mr. Izzo testified that he did not learn of the Big Cap 90 fund until late in 1985. Yet, Dr. Lanka testified that he learned of the fund from Mr. Izzo prior to this meeting, which allegedly occurred in April of 1985.

**9.** Mr. Izzo, while not acting as an investment advisor, was kept apprised of the status of the portfolio with quarterly statements that were sent to him by the defendant and/or Mr. Briggs as a professional courtesy since he had recommended the defendant to Dr. Lanka. Thus, he, being a stockbroker and fully familiar with the stock market, was able to indicate to Dr. Lanka when the market was high and when it was a good time, in his opinion, to make the transition to the Big Cap 90 plan.

that the stocks should be held for a little longer; they expected the next cycle soon.

Dr. Lanka testified that all of his inquiries to Mr. Briggs resulted in the same response: "when the time was right;" "when the time was appropriate."

Despite their expressed desire to diversify as soon as possible, Dr. Lanka testified that they believed in the defendant's professionalism.

According to Dr. Lanka, in late September or October of 1986, Dr. Lanka, Ms. Anapolis and Mr. Briggs met in the dental offices. At that time, in response to their concern over the portfolio, Mr. Briggs again explained that the defendant's policy was to await a return in the value of the stocks and not to invest in the Big Cap 90 plan until then.

Thereafter, in October of 1986, Dr. Lanka telephoned Mr. Briggs and requested the current value of the portfolio. On the following day, Dr. Lanka called Mr. Briggs again and expressed his desire to terminate the defendant as investment manager for the plans. Dr. Lanka spoke to the defendant at that point and inquired of the defendant whether he would have handled the plans in the same way as he had if it was "day one," to which the defendant responded in the affirmative. After Dr. Lanka formally terminated the defendant, Mr. Briggs took it upon himself to call Dr. Lanka. He advised him that if he wanted the portfolio transferred into the Big Cap 90 that badly, that could be accomplished within one week and that there would be no management fee charged for one year. Dr. Lanka did not change his decision to terminate the defendant's services.

At Dr. Lanka's direction, the profit sharing plan was transferred to Cowan & Co. under the management of Mr. Francis Trombly; the pension plan was transferred to Payne Webber under the control of Mr. Izzo. The plans, at the time of their transfer, were valued at $233,455 and $109,625 respectively for a total value of $343,080. At this time, 98% of the portfolio was invested in three stocks—INCO, MCI and Navistar—all of which were at or near their all-time lows and were below the level at which they had been purchased. By letter to the plaintiffs' attorney, the defendant stated that the portfolio had declined in value by $91,131.94 as of November 3, 1986. (Plaintiffs' Exhibit No. 18) Over the next six to eighteen months, at the direction of Dr. Lanka, the three stocks were sold off and the funds reinvested.

*Conclusions of Law*

The plaintiffs have set out, in their trial brief, four questions they contend are presented in this case:

1) what is the appropriate standard to be applied to an investment manager's performance when that person manages ERISA pension and profit sharing funds?

2) what duties does that standard impose on him?

3) did the defendant breach any of those duties in his management of the plan funds?

4) (if applicable) what is the measure of damages to be awarded the plaintiffs?

In addressing these questions, it is helpful to set out the statutory provisions as they are applicable to the facts in the case at bar:

The plans are duly qualified plans pursuant to the Internal Revenue Code, section 401 (Stipulation at ¶ 3); they are "employee pension benefit plans" within the definition of ERISA, *see* 29 U.S.C. § 1002(2).

The parties have stipulated that the defendant was acting as an investment manager; that he was a fiduciary.[10]

---

10. Section 1002(21)(A) of title 29 of the United States Code [hereinafter referred to as "ERISA"] defines a "fiduciary" with respect to a plan as: "a person [who] to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets; (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

Section 1104 of title 29 of the United States Code sets out the fiduciary duties. Subsection (a)(1) provides in pertinent part that:

"a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter."

Should a fiduciary breach his obligations or duties imposed by ERISA, then he shall be:

"personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable and remedial relief as the court may deem appropriate."

29 U.S.C. § 1109(a).

The plaintiffs allege that the defendant, in essence, failed to act in accordance with both 29 U.S.C. § 1104(a)(1)(B) & (C) in that he failed to diversify and otherwise act with the care, skill and prudence required

of him, thereby breaching his fiduciary duties to them as plan participants and beneficiaries.

■ As set out fully *supra*, section 1104(a)(1)(C) imposes upon the fiduciary the duty to "diversify the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it was clearly prudent not to do so." Neither this statute, nor the regulations that have been promulgated thereunder, *see* 29 C.F.R. § 2550.404a–1, specifies any precise percentage requirements for the diversification of ERISA plans. The legislative history, however, does provide some guidance. Seven factors may be considered in determining the degree of concentration that would violate the diversification requirement:

1) the purpose of the plan;

2) the amount of plan assets;

3) financial and industrial conditions;

4) the type of investment, whether mortgages, bonds or shares of stock or otherwise;

5) distribution as to geographical location;

6) distribution as to industries; and

7) the dates of maturity.

H.R.Rep. No. 93–1280, 93d Cong., 2d Sess. 304, *reprinted in* 1974 U.S.C.C.A.N. 4639, 5038, 5084–85 (*as cited in Jones v. O'Higgins,* No. 87–CV–1002, slip op. at 11, 1989 WL 103035); *see also Marshall v. Glass/Metal Ass'n and Glaziers and Glassworkers Pension Plan,* 507 F.Supp. 378 (D.Haw.1980) (duty of fiduciary to spread the risk of loss to the plan). In short, the percentage of concentration of investments/diversification must be considered based upon the facts and circumstances of each case. *Id.* at 5085.

■ Thus, in this type of action, it is has been held that the burden is on the plaintiff to demonstrate that there has been a violation of the diversification requirement. *Jones v. O'Higgins,* No. 87–CV–1002, slip

*See also Jones v. O'Higgins,* No. 87–CV–1002, slip op. at 9–10, 1989 WL 103035 (N.D.N.Y. Sept. 1, 1989).

op. at 12, 1989 WL 103035 (*quoting id.* at 5084). If the plaintiff is successful in this burden, then the burden shifts to the defendant fiduciary to demonstrate that his failure was prudent. *Id.* If the defendant is unsuccessful in demonstrating that he was prudent, only then can the court find that he has breached his fiduciary responsibilities and consider the appropriate measure of damages. *See Davidson v. Cook,* 567 F.Supp. 225, 238 (E.D.Va.1983), *aff'd sub nom., Accardi v. McGuire, Woods & Battle,* 734 F.2d 10 (4th Cir.), *cert. denied, sub nom., Accardi v. Davidson,* 469 U.S. 899, 105 S.Ct. 275, 83 L.Ed.2d 211 (1984); *Marshall v. Glass/Metal Ass'n and Glaziers and Glassworkers Pension Plan,* 507 F.Supp. 378, 384 (D.Haw.1980); *In re Kellogg's Trust,* 35 Misc.2d 541, 550–53, 230 N.Y.S.2d 836, 844–47 (Sup.Ct. Erie County 1962).

The defendant has stipulated, and on the facts of this case it is clear, that in investing the portfolio in only three stocks, the portfolio was concentrated, and not diversified.

Thus, the burden shifts to the defendant to demonstrate that his investment decisions were clearly prudent under the circumstances. *See* 29 U.S.C. § 1104(a)(1)(C).

Since 29 U.S.C. § 1104(a)(1)(B) and (a)(1)(C) both require a prudent man standard to be employed by a fiduciary of an ERISA plan in carrying out his duties, the court will discuss the requirements of these sections together.

■ It is not a business judgment rule that applies to the question of prudence in the management of an ERISA plan, but rather a prudent person standard. *Donovan v. Mazzola,* 716 F.2d 1226, 1231 (9th Cir.1983), *cert. denied sub nom., Mazzola v. Donovan,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). The court in *GIW Indus., Inc. v. Trevor, Stewart, Burton and Jacobsen, Inc.,* 10 Employee Benefits Cas. (BNA) 2074 (S.D.Ga.1989) (*citing Marshall v. Glass/Metal Ass'n and Glaziers & Glassworkers Pension Plan,* 507 F.Supp.

378, 384 (D.Haw.1980)), *aff'd,* 895 F.2d 729 (11th Cir.1990) held that:

"[T]he prudence rule does not make the fiduciary an insurer of the plan's assets or of the success of its investments. ERISA does not require that a pension fund take no risk with its investments. Virtually every investment entails some degree of risk, and even the most carefully evaluated investments can fail while unpromising investments may succeed."

■ However, the fiduciary's subjective, good faith belief in an investment does not insulate him from the charges that he acted imprudently. *Donovan v. Bierwirth,* 538 F.Supp. 463, 465 (E.D.N.Y.1981), *aff'd,* 680 F.2d 263, 269 (2d Cir.), *cert. denied sub nom., Bierwirth v. Donovan,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Rather, the prudent person standard has been determined by the courts to be an objective standard, requiring the fiduciary to (1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) exercise independent judgment when making investment decisions. *Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir.), *cert. denied sub nom., Cody v. Donovan,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Jones v. O'Higgins,* slip op. at 18; *Whitfield v. Cohen,* 682 F.Supp. 188, 194–95 (S.D.N.Y.1988). This standard requires that the fiduciary's behavior be measured as against the standards in the investment industry. *Jones v. O'Higgins,* No. 87–CV–1002, slip op. at 19, 1989 WL 103035.

■ While the mere failure to sell declining stock is not imprudent, *American Communications Ass'n v. Retirement Plan,* 488 F.Supp. 479, 483 (S.D.N.Y.), *aff'd,* 646 F.2d 559 (2d Cir.1980); *Stark v. U.S. Trust Co.,* 445 F.Supp. 670, 678–79 (S.D.N.Y.1978); *In re Kellogg's Trust,* 35 Misc.2d at 550–53, 230 N.Y.S.2d at 844–48,[11] liability may attach when the plan beneficiaries suffer "at the slightest sug-

---

11. Indeed, it has been held that the failure to sell a stock declining in value was prudent un-

der the circumstances. *Jones v. O'Higgins,* No. 87–CV–1002, slip op. at 19, 1989 WL 103035.

gestion that any action taken was with other than the beneficiaries in mind," *Morse v. Stanley,* 732 F.2d 1139, 1145 (2d Cir.1984),[12] or if the defendant was negligent in administering the plan, *see McNeese v. Health Plan Marketing, Inc.,* 647 F.Supp. 981 (N.D.Ala.1986).

■ Fiduciaries have a statutory duty dependent upon the purposes of the plan. *Fine v. Semet,* 514 F.Supp. 34 (D.Fla.1981), *aff'd,* 699 F.2d 1091 (1983); *Marshall v. Glass/Metal Ass'n and Glaziers & Glassworkers Pension Plan,* 507 F.Supp. at 383. Indeed, it has been held that an investment manager has a duty to inquire of the particular needs of the plan vis-a-vis its participants. *GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.,* 895 F.2d 729, 733 (11th Cir.1990); *Fink v. National Sav. & Trust Co.,* 772 F.2d 951, 962 (D.C.Cir.1985) (Scalia, J.). The plaintiffs allege that the general purpose of their retirement plans was to foster steady growth, while avoiding the unnecessary risk of a major loss in asset value. They assert that the plans were ultimately aimed at providing for the retirement of the participants of the plans at any given time. The defendant, on the other hand, testified that he had been told only of the retirement plans of Dr. Lanka, whose retirement was a full thirteen years in the future at the time that he was retained.[13]

■ While the plaintiffs acknowledge that the three stocks in which the defen-

dant had invested the portfolio assets did rise in value, *see* Trial Brief at 11, they assert that in failing to diversify the assets in this case imposed upon the participants and beneficiaries an unnecessary risk which was unsuitable for them and their retirement needs. Mr. Simon John Aman, the defendant's expert, testified that despite the small number of stocks invested for the portfolio, the risk of loss was mitigated because the stocks were 1) diversified as to industry, 2) they were bought at or near their all-time lows, and 3) because of the large size of each of the three companies, they were unlikely to collapse overnight but if they were to do so, it would be a slower decline and thus they could be sold off so as to minimize the overall loss to the portfolio.

■ The plaintiffs' expert, Mr. Daniel Steinberg, testified that applying the "contrarian investment philosophy"[14] to an ERISA plan was per se imprudent, that the industry would not permit such management of what he called "sacred" funds. He grounded his view on the risk element involved, the full discretion over the account which must be exercised by the contrarian, the lengthy time element needed to realize a turnaround in the stocks, and the nature of the fiduciary responsibility involved in managing ERISA accounts. The defendant's expert, Mr. Simon John Aman, of course, opined otherwise. Both experts acknowledged the identities of various oth-

---

**12.** It is not alleged in any way by the plaintiffs that in acting as he did that the defendant was acting to further his own interests or those of anyone other than a plan participant. Indeed, it would behoove him to see to it that the plans increased in value rather than decreased since his management fee was determined by the value of the two plans.

**13.** While it may have indeed been the case that the defendant failed to investigate the individual retirement needs of the individual plan participants, investigation would have revealed the following:

| Plan Participant | Date of Birth | Age on 10/31/86 |
|---|---|---|
| Dr. Thomas Lanka | 5/13/36 | 50 |
| Dr. Gordon L. Wright | 2/5/40 | 46 |
| Ms. Sylvia Anapolis | 3/29/40 | 46 |
| Ms. Loretta C. Maurer | 4/18/42 | 42 |
| Mrs. Terry Hunsinger | 10/10/45 | 41 |

The court has not been provided with the ages of the remaining plan participants, including Ms. Helen M. Carey, who it was alleged had to delay her retirement for a period of one and one-half years due to the decrease in value of the pension and profit sharing plans.

**14.** The "contrarian investment philosophy" is one in which the investor looks at the stock market, assesses which stocks are at or near their all-time lows and then invests in those stocks. He purchases stocks which have either started to improve or which he believes, due to a change in market conditions, will improve. The stocks are then held for a period of time so as to realize a profit and then sold. The process then begins again.

er noted "experts" in the field of investment management, several of whom Mr. Aman characterized as "contrarians."

The plaintiffs' expert further opined that even if full disclosure of the investment management method were made to the trustee of an ERISA plan, the mere employment of the "contrarian method" was imprudent and a breach of fiduciary responsibility. No authority can be found to support the plaintiffs' expert's per se imprudence contention. As such, this court is unwilling to accept such as opinion and rather will look to the circumstances of this case to determine whether this investment manager acted imprudently vis-a-vis these ERISA plans.

Here, the plaintiffs purposefully and deliberately selected the defendant as their investment manager being intimately familiar with his philosophy of investment management. They were familiar with his "contrarian" methods both from his brochure, from the literature that he provided and from his presentation to the doctors and the plan participants in April of 1984. The defendant explained that he assessed the market in light of the world economy and international trade, determining which industries were doing poorly as a result of the soft dollar. He explained that he would then select a few stocks from those industries, restricting his selections to stocks of large, well-established companies, and would invest the plan assets.

The plaintiffs were advised that his philosophy entailed investing based upon cycles in the world economy and in the market. He explained that utilizing such an investment plan takes time; the economic cycles are not predictable with any degree of certainty. He conceded that there are risks, but contends that the potential profits are proportionate to the risks.

At trial, the defendant explained how he selected the three stocks that comprised the portfolio when he was terminated as the plaintiffs' investment manager. First, he assessed the world market, the international trade environment. Then, he selected various industries that he believed had been affected by the world economic cli-

mate. With these industries in mind, he then looked to select specific stocks within those industries that he felt fit within he contrarian philosophy. In this instance, the defendant was clearly fully familiar with the three companies involved. Indeed, in the case of Navistar and MCI, he knew personally several of the upper-level corporate executives. He had knowledge of the corporate debt of each of the companies and their stability given the world economic and trade conditions that then existed. He expected, given the projections in the world economy and the financial marketplace, that investing in these stocks would reap financial rewards for the plaintiffs and the other investors for whom he purchased these stocks. He acknowledged that inherent in such an investment plan was risk. However, as the plaintiffs' own expert acknowledged, "No one has a crystal ball."

The plaintiffs were well aware of the risks. They were well aware of the defendant's investment philosophy. They selected him as their investment manager based upon his history of success in investment management, a history that evolved by virtue of his investment philosophy.

Thus, the prudent man criteria articulated in *Katsaros, supra,* have all been met, i.e., the questions all result in affirmative responses:

(1) that the defendant did employ proper methods to investigate, evaluate and structure the investment;

(2) that he acted in a manner as would others who have a capacity and familiarity with such matters; and

(3) that he exercised independent judgment when making investment decisions.

Therefore, despite the testimony of the plaintiffs' expert, under the circumstances in this case, the defendant cannot be seen to have acted imprudently in violation of either 29 U.S.C. § 1104(a)(1)(B) or 1104(a)(1)(C).

■ The plaintiffs also allege that the defendant breached his fiduciary duties in that he failed to comply with their wishes that he diversify the portfolio, specifically that he transfer the assets of the plans into the Big Cap 90 plan.

While it is indeed true that the failure to comply with the demands of a plan trustee on the issue of diversification has been held to be a breach of an investment manager's fiduciary duties, *see, e.g., Utilicorp. United Inc. v. Kemper Fin. Serv., Inc.*, 741 F.Supp. 1363 (W.D.Mo.1989), here, the evidence at the trial simply does not support the plaintiffs' position. There is absolutely no evidence that the plaintiffs in general or Dr. Lanka in particular ever *specifically* directed, either orally or in writing, the defendant to move the assets of the pension or profit sharing plans out of the three stocks in which they were invested and into the Big Cap 90. While the plaintiffs obviously made their wishes known to the defendant personally and to him through his account administrator, Mr. Christopher Briggs, they did not ever expressly state that they wanted the transition accomplished immediately; they did not provide him with any temporal or dollar amount deadline for the transition. Indeed, the testimony is in agreement that in each instance where the transition to the Big Cap 90 was discussed with either Mr. Briggs or with the defendant that they were told and accepted that the assets would be transferred when the time was right/as soon as practicable. In fact, as late as June of 1986, Dr. Lanka agreed to allow the defendant to exercise his professional expertise to determine when the time was appropriate to make the transition.

The situation is best characterized by a review of the testimony of Dr. Wright, who stated that the defendant was being paid to determine when it was appropriate to make the switch, to use his judgment; the plaintiffs depended upon him to make a good decision that it was his decision to make; and if the plaintiffs were not satisfied with his decisions, they could terminate him.

While the defendant could have been more receptive to the desire of the plaintiffs to transfer their investments into a more diversified plan, he was under no legal obligation to do so, his contract allowed him to use his discretion. If defendant had specifically agreed to make the transfer of invested funds into Big Cap 90 at a specific time, and then failed to do so, there might have been a breach of fiduciary duty. However, the evidence does not support this finding. The plaintiffs as trustees had the right to terminate the defendant as their investment manager at any time (which they later did in October of 1986). Having declined to do so, they cannot now complain of the decisions he made, which the Court finds were not unreasonable or imprudent under the circumstances.

CONCLUSION

Although through stipulation of the parties it was established that the defendant failed to diversify the plaintiffs' pension and profit sharing plans, the defendant has demonstrated that he was not acting imprudently in doing so. Additionally, the plaintiffs have failed to prove that the defendant breached his fiduciary responsibilities by failing to comply with their directions. As such, the plaintiffs' claims against the defendant are dismissed in their entirety.

IT IS SO ORDERED.