**ULICO CASUALTY COMPANY,
Plaintiff,**

v.

**CLOVER CAPITAL MANAGEMENT,
INC., Defendant,**

**No. 3:00–CV–773.**

United States District Court,
N.D. New York.

Sept. 14, 2004.

Proskauer Rose LLP (Myron D. Rumeld, Esq., Kamau Coar, Esq., of Counsel), New York City, for Plaintiff.

Wolford & Leclair LLP (Michael W. Wolford, Esq., Steven E. Cole, Esq., of Counsel), Rochester, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

MUNSON, Senior District Judge.

Plaintiff Ulico Casualty Company ("Ulico"), instituted this lawsuit against Defendant Clover Capital Management, Inc.("Clover"), under §§ 404(a)(1)(B); 404(a)(1)(D)—Fiduciary Duties—Prudent Man Standard, and 405(a)(2)—Liability for breach of a co-fiduciary—Circumstances given rise to liability, of the Employment Retirement Income and Security Act ("ERISA"), 29 U.S.C §§ 1104(a)(1)(B); 1104(a)(1)(D); and 1105(a)(2). A state

common law breach of contract cause of action was dismissed as preempted by the ERISA as part of a decision made May 11, 2001, by the Hon. Thomas J. McAvoy in a prior summary judgment motion made in this case. This non-jury case was tried before this court on January 29, 30, and February 3, 4, 5, 2003.

Plaintiff Ulico underwrote fiduciary liability coverage to the Funds and their Trustees. Clover Capital Management, Inc. is an asset manager for individuals, employee benefit plans, endowments and foundations, and is a registered investment advisor. Laborers International Union of North America Local 35 Pension Fund, Local No. 322 Pension Fund and Carpenters Local No. 120 Pension Fund (collectively the "Funds") are employee pension benefit plans within the meaning of ERISA 29 U.S.C. § 1002(2)(A). Clover became the investment manager for all three Locals in February/March 1995. Local 35 ended its relationship with Clover on March 23, 1999, and Locals 322 and 120 did so on May 1, 2000.

The complaint asserts that the defendant has breached ERISA fiduciary obligations while managing assets of the Funds' pension plans. Before this court are the questions of whether defendant breached and ERISA duty by (1) failing to satisfy the "prudent man" standard of 29 U.S.C § 1104(a)(1)(B) and (D), by not conducting a careful analysis before selling the Fund's major assets at a loss, and 29 U.S.C. § 1105(a)(2) his not complying with § 1104(a)(1) enabled another fiduciary to commit a breach. The following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

This action was begun as a result of previous lawsuits brought by the United States Department of Labor (DOL) against the Trustees of these three unions pension Funds alleging that they had improperly invested in Z–Bonds and sold them at a significant loss to the Funds. Z–Bonds are a class, or tranche, of Collateralized Mortgage Bonds ("CMOs") which are real estate mortgage investment conduit bonds that are derivative of mortgage-backed securities. These bonds are considered volatile because an upward change in the interest rate could result in a appreciable decrease in their market value.

**Background and Findings of Fact**

The witnesses' testimony laid out in detail the events and individual actions taken regarding the Funds' purchase and sale of their Z-bonds investments.

From 1988 to 1995, the trustees of the Funds retained W.J. Nolan & Company ("Nolan"), a broker in mortgage backed securities, to invest in fixed income securities on behalf of the Funds. Starting in 1992 and proceeding through 1994, Nolan acquired Z-bonds for the Funds. At the end of 1994, the Funds portfolio of investments purchased by Nolan consisted principally of Z-bonds. During that same year, the market value of Z-bonds dropped substantially.

At a joint meeting of the boards of Trustees of the Funds, held August 10, 1994, Stephen Thomas, of O'Sullivan Associates, the Funds actuary and monitor, addressed the Trustees. He stated that the returns on the W.J. Nolan brokerage account looked poor, the Trustees should consider retaining an investment manager.

The Funds actuarial strength, relied in part, on the current market value of the investment assets, and not the yield to maturity of those assets. Actuarial funding is based upon the market value of assets. The market value of the Funds' assets consist of investment yield and market value fluctuations, appreciation and depreciation are counted and included in the value of the securities, and even if a security pays a guaranteed yield, for actuarial

purposes and governmental reporting, it must looked at each year. (Thomas Dep. 47–50). This is emphasized on page 5 of the minutes of the August 10, 1994 meeting, the second paragraph from the bottom recites that "since benefits improvements are based on market value assets, it is no consolation to rely on return only, even if the investments are held to maturity." (*Id.*)

Market value increase or decrease from the prior year and actuarial information are reported to the government on Form 5500 prepared by the Funds' accountants. This means that fluctuating· market value in the assets held by a pension fund have very direct consequences on the way the government perceives their funding activities. Tr. 616–18 (Holmer), Defendant's Exhibits 100–102.

In the fall of 1994, the Funds' Trustees decided to retain other investment managers for their Nolan portfolios. At the request of Gerald Scotti, the Funds manager, on September 27, 1994, Clover's William Wilson made an oral and written presentation to the Trustees describing the services Clover was prepared to provide to the Funds.

In the presentations to the trustees of each of the Funds, Clover's representative stated that attempting to predict interest rate changes was a highly risky undertaking and it virtually guaranteed poor long term results. Consequently, Clover would not attempt to predict interest rates in its bond management efforts. Clover called it portfolio objective "Income Emphasis" having approximate mixed targets of 70% fixed income securities and 30% equity securities. (Tr. 375–76) Tr. 15 (Bergeron) Clover described its "market risk" fixed management approach where fixed income instruments with short, medium and long maturities are utilized to achieve a maturity with an average duration of approximately 8 to 10 years and an average dura-

tion of approximately 5 years. (Tr. 389–90)The trustees also received a detailed presentation booklet describing Clover's investment style with respect to equities and fixed income investments.

After the presentations were made to the trustees of the Funds by the various investment manager entities, the trustees of each of the Funds voted to hire Clover as an investment manager, and to transfer the securities in the Nolan portfolio to Clover's management.

The trustees further resolved that a portion of the assets assigned to Clover would eventually be transferred to one or more investment managers. For the Local 35 Fund, the transfer would be made to Loomis, Sayles & Company ("Loomis Sayles") which would result in Clover and Loomis Sayles having an equal amount of the assets formerly in the Nolam portfolio; for the Local 120 Fund, a transfer would be made that would result in HGK Asset Management, Loomis Sayles and Clover managing approximately equal portions of all pension funds available for investment; and for Local 322, a transfer of $1 million of assets to Manning & Napier, an existing investment manager for Local 322.

In January 1995, after Clover had evaluated all the Nolan Z-bonds in the various management portfolios, it decided to liquidate the Nolan Z–Bonds to cash and transfer the proceeds pro rata to the other invest managers as soon as possible. The other managers of the Funds had advised Clover that they were not interested in acquiring any of the Z–Bond securities either. Tr. 393. Liquidating the Z–Bonds would produce cash for funding the other managers' accounts and permit Clover's to carry out it's equity and fixed income investment programs. Clover then sold the Z–Bonds at a significant loss to the Funds.

There is disputed testimony between the Trustees and Clover as to whether the

Trustees or their representatives directed Clover to sell the Z–Bonds, or whether Clover did it on its own initiative. However, the court finds that it is unnecessary to the determination of liability in this case for a decision to be made as to which testimony is more credible.

In 1998, the ("DOL") commenced its lawsuits against the Trustees for breaching their fiduciary duties and sought recovery of all losses in market value to the Funds attributable to the Z-bond investment from 1992 through 1994. The DOL complaint did not allege that the Z–Bonds sale failed to comply with the prudent man standard of care set forth in § 1104(a)(1).

The Trustees entered into Consent Decrees with the DOL, that discontinued the lawsuits and provided that the Trustees would make payments to the funds in the amount of $3 million, plus a 20% penalty under 29 U.S.C. § 1132(1). Ulico took responsibility for the defense of the DOL lawsuits, and payments of the $3 million settlement, and the $600,000 penalty. Ulico and the trustees then executed a settlement agreement which provided, *inter alia*, that the Trustees assigned, transferred, and conveyed to Ulico all claims, causes of action, rights and recoveries against all parties responsible for the losses sustained by the Funds including but not limited to Clover . . . based upon, or arising from Clover's management and sale of the Z-bonds referred to in the DOL action. Ulico thereupon started the instant action against Clover.

### The Legal Standard

In its first cause of action, Ulico alleges that Clover breached its fiduciary duty under 404(a)(1)(B) of ERISA 29 U.S.C. § 1104(a)(1)(B)and (D).

Fiduciaries under ERISA are obligated to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in his conduct of an enterprise of like manner of a like character and with like aims," 29 U.S.C. § 1104(1)(B), and, (D) "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter." § 1104(a)(1)(c), also imposes a duty of diversification whereby the fiduciary should not normally invest all or an unduly large portion of plan funds in a single security, or any one type of security, or even in various securities that depend on the success of one enterprise. *Marshall v. Teamsters Local 282 Pension Trust Fund*, 458 F.Supp. 986, 990 (E.D.N.Y.1978)

The source of the standard set forth in these sections is the objective "prudent person" standard developed in the common law of trusts. *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984); *cert. denied sub nom, Cody v. Donovan*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

ERISA's prudence standard "is not that of a prudent person but rather that of a prudent fiduciary with experience dealing with a similar enterprise." *United States v. Mason Tenders District Council of Greater New York*, 909 F.Supp. 882, 886 (S.D.N.Y.1995)(quoting *Marshall v. Snyder*, 1 Empl. Ben. Cases (BNA) 1878, 1886 (E.D.N.Y.1979)). In enacting ERISA, "Congress made more exacting the requirements of the common law of trusts relating to employee benefit trust funds." *Donovan*, 716 F.2d at 1231–32; *Reich v. Valley National Bank of Arizona*, 837 F.Supp. 1259, 1273 (S.D.N.Y.1993)(ERISA is a more stringent version of the prudent person standard than in the common law). *Rice v. Rochester Laborers' Annuity Fund*, 888 F.Supp. 494, 499 (W.D.N.Y. 1995); *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir.) *cert. denied*, 459

**340**

U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)(duties of an ERISA fiduciary are the highest known in law).

> [T]he prudence rule does not make the fiduciary insure the plan's assets or of the success of the investments. ERISA does not require that a pension take no risk with its investments. Virtually every investment entails some degree of risk, and even the most carefully evaluated investments can fail while unpromising investments may succeed.

*Marshall v. Glass/Metal Association and Glaziers & Glassworkers Pension Plan,* 507 F.Supp. 378, 384 (D.Haw.1980), aff'd. 895 F.2d 729 (11th Cir.1990). However, the fiduciary's subjective, good faith belief in an investment does not insulate him from charges that he acted imprudently. *Donovan v. Bierwirth,* 538 F.Supp. 463, 465 (E.D.N.Y.1981).

 ERISA's prudent person standard has been interpreted by the courts as an objective standard requiring (1) to employ proper methods to investigate, evaluate and structure the investment; (2) to act in a manner as would others who have a capacity and familiarity with such matters; and (3) to exercise independent judgment when making investment decisions. *Mason Tenders,* 909 F.Supp. at 886; *Lanka v. O'Higgins,* 810 F.Supp. 379, 387 (N.D.N.Y.1992). This standard requires that the fiduciary's behavior be measured against the standards in the investment industry. *Lanka,* 810 F.Supp. at 387. In evaluating whether a fiduciary acted prudently under ERISA, the court should inquire whether the fiduciaries "at the time they engaged in the challenged transaction, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Katsaros,* at 279. ERISA's test of prudence is one of conduct, and not a test of the result of performance of action taken by the fiduciary. The focus of the inquiry is what steps the fiduciary took before making the decision to act, and not whether the action succeeded or failed. *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). The right inquiry, therefore, is whether the fiduciary, prior to making the challenged transactions, employed appropriate methods to investigate the merits and merits of the actions to be taken. *Donovan v. Mazzola,* 716 F.2d 1226, 1227 (9th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). So the court must look to the time the fiduciary was making the decisions regarding the Funds, and not hindsight. *United States v. Mason Tenders District Council of Greater New York,* 909 F.Supp. 882, 886 (S.D.N.Y.1995).

Ulico's second cause of action alleges that Clover violated 29 U.S.C. § 1105(a)(2), which provides that "[A] fiduciary with respect to a plan shall be liable for breach of fiduciary responsibility of another fiduciary with respect to the same plan ... if, by his failure to comply with section 1104(a)(1) of this title in the administration of the specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach".

**Discussion and Conclusions of Law**

The crucial issue in the instant case is whether Clover breached its fiduciary duties when it liquidated the Funds' Z–Bonds portfolio to cash in making the transition of assets to the other investment managers and to implement it Income Emphasis portfolio for the Funds. Ulico contends that the evidence adduced at trial clearly demonstrate that Clover failed to act in accordance with the prudent person standard set forth in ERISA by failing to investigate whether the 1995 liquidation to cash was the most appropriate means of

accomplishing the transition of assets between investment managers.

Dr. Martin R. Holmer, Clover's expert, obtained his PhD in economics from the Massachusetts Institute of Technology. He taught and researched portfolio selection and mortgage securities at the University of Pennsylvania Wharton School of Finance. He has published articles on portfolio choice, risk return, trade-offs to get optimum portfolios where mortgaged backed securities were involved as a choice set. He was an expert witness for the U.S. Department of Labor in a case concerning a pension fund's trustees CMOs purchases. He employed by the U.S. Government as a director of a large research program concerning Social Security, by E.F. Hutton in their CMO group and developed the computer simulation model that allowed Hutton to issue CMOs. He was at Federal National Mortgage Corporation (Fannie Mae) where, for over five years as vice president for asset/liability strategy, he assisted in constructing their computer simulation capabilities to trade off risk and return in their mortgage portfolio which is probably the world's largest. Fannie Mae also issued mortgage backed securities and some of the Funds' CMOs were Fannie Mae originated. After leaving Fannie Mae, he started the Policy Simulation Group, an economic consulting firm. His company's self-built computer simulation model reproduced fluctuating values in defined benefit pensions and the funding, and the pension plan sponsor's responses, or lack thereof to fluctuating asset values. This monitoring procedure was needed because insurance companies collected premiums and paid claims, and the bankruptcy of an insured sponsor of an underfunded pension plan could result in a sizable loss claim.

The testimonies of Dr. Holmer, and Clover employees Richard Huxley, Paul W. Spindler and William Wilson in this case support the reasonableness of Clover's decision to transition the assets as cash rather than as securities. The difference in investment strategies between Clover and Nolan made it relatively certain that Clover would liquidate the Z–Bond portion of the portfolio when it was transferred, and the other new investment managers indicated that if they had received the Z–Bonds, they also would have liquidated them. Additionally, the disappointing results from the Nolan portfolio made it suitable to liquidate the portfolio to cash to better the chances for the new managers to implement more quickly their new management investment strategy.

Dr. Holmer testified that from the materials and depositions that he had read, Clover's sale of the Z–Bond was correct because before doing so, it had considered a wide range of issues involved in reaching the decision on whether to hold the Z–Bonds, or sell them and use the proceeds to purchase other securities. Among those considerations were statistical data from the Bloomberg screens, yield to maturity, shorter term market value risk and diversity of the portfolio it was assuming. (Tr. 619).

Richard Huxley, Executive Vice President and Director of Fixed Income Management for Clover, testified that when Clover received a list of the Funds' assets in the Norton portfolio, Paul W. Spindler, a portfolio manager analyst, who had been assigned the portfolio management responsibilities for the Funds' accounts, loaded each individual security into Clover's internal software systems, which then produce a report that gave an overall view of the types of securities that were in the portfolio and what the overall characteristics of the portfolio were in total.

After viewing the report, Messsrs. Huxley, Spindler and William Wilson, Clover's Director of Institutional Sales, con-

ferred and decided that since the weighted average duration of the portfolio was twenty years, the Funds' portfolio would have to be significantly reconstructed to supply the funds needed for the equity portion of the portfolio, and to reconfigure the bond portfolios to correspond with the central mandate and jibe with Clover's strategies and model portfolio at that time. (Tr. 584–587).

William Wilson testified that he initiated a telephone conference call on a January 25, 1995, between himself, Messers Huxley and Spindler, Gerald Scotti, third party administrator to the Funds' pension plans, and Steve Thomas, the Funds' actuary. During this call, the Clover representatives explained that examining the Funds' portfolio, it was concluded that a substantial liquidation of the portfolio was necessary to acquire the funds needed for the equity portion as well as reconfiguring the remaining dollars to Clover's core fixed income strategy. The Clover personnel then explained in detail how they reached their conclusion. Mr. Scotti and Mr. Thomas understood the information that was conveyed by Clover, and no objections were raised thereto. At the end of the discussion, Mr. Scotti advised the Clover people that he had heard from the other investment managers the Funds had hired, and they were not interested in keeping any of the Z–Bonds either, and would Clover complete the sale of the Z–Bonds because it did not appear that Clover was interested in keeping them either. Clover agreed to do so. On January 27, 19951, Mr. Wilson sent Mr. Scotti a letter confirming the discussions that had taken place during the telephone conference (Tr. 391–393).

█ Clover's sale of the Z–Bonds did not violate its fiduciary duty under ERISA. In *Board of Trustees of Local 295/Local 851 Pension Fund v. Callan Associates Inc.*, 175 F.3d 1007, 1999 WL 159893 (2d Cir.1999), the Second Circuit

held that even though the plaintiff pension funds sustained a loss of approximately $1.5 million, it was acceptable in the investment community in 1995 for asset transition between fixed income managers to be executed through a liquidation to cash method similar to what was done in 1995 by Clover when it sold the Z–Bonds. The Second Circuit further found that because of this investment community acceptance, the use of this transition method did not breach the fiduciary duty under ERISA, nor was the fiduciary required to undertake additional investigation of alternative transition methods.

The plaintiff's expert witness was Dr. Andrew S. Carron, an economic consultant who earned his PhD in economics at Yale University. He worked for several years at the Brookings Institute in Washington D.C., a not-for-profitpublic policy research organization. While there, he studied and wrote on financial products, markets and institutions. In 1984 he left Brookings and moved to Wall Street, where he was employed for 12 years, the first two at Lehman Brothers and, the final 10, at Credit Suisse First Boston. In 1996, he took his current position with National Economic Research Associates. He is qualified to testify regarding portfolio management and CMO investment. He has provided expert testimony in state and federal courts and before enforcement proceedings of U.S. government agencies, in arbitrations under the auspices of the National Association of Securities Dealers.

Dr. Carron testified that Clover's method of selling the bonds was imprudent and resulted in the aggregate proceeds received by the Funds being approximately $720,000 (TR. 233–257) less than the market prices at the time of the sale, and that the Z–Bonds should have been retained by Clover or sold gradually. (Tr. 241) He also stated that Clover should have under-

taken a quantitative analysis in which the relative yield of the Z–Bonds and the securities that would be purchased in their stead would be compared under different scenarios, and using a comparable benchmark as a source of measurement; the relative yields would then be evaluated in conjunction with other relevant considerations such as risk (Tr. 195–205).

On direct examination, Dr. Carron did acknowledge that there are a number of different approaches that institutional investors use in deciding to purchase or sell fixed income securities. (Tr. 194) On cross examination, he stated that his opinion is only directed at the sale of the Z–Bonds, he has not expressed an opinion about Clover's Income Emphasis strategy, but if Clover had started with cash, he would not find anything imprudent about the stocks and bonds Clover purchased for the Fund, but, in hindsight, Clover would have done better with the Z–Bonds. (Tr. 442–444). He also stated that he was not sure whether and to what extent and what type of analysis Clover did in reaching its decision to sell the Z–Bonds. (Tr. 448–450). Dr. Carron also admitted that he no experience as a bond trader. (Tr. 506). Dr. Carron states that Clover received a below market price for the Z–Bonds it sold because they were offered to too many dealers coincidently, which could have manifested oversupply. He tested this theory by examining third-party pricing sources for Z–Bonds on the sale date, and calculating the difference between the third party pricing sources and the actual sales price. (Tr. 255). He did admit, however, that he did not know what the volume of Z–Bond sales were on the dates of Clover's sales. (Tr. 566). Nor did he show that entities using fewer dealers on the same days as Clover's Z–Bonds sales were selling the same or comparable bonds at higher prices than Clover. (Dr. Holmer, Tr. 631). Paul Spindler testified that soliciting more bidders resulted in actual sales prices being closer to model prices for the Z–Bonds Clover sold. (Tr. 691–92).

Using a Bloomberg terminal, Dr. Carron accessed two pricing services, FT Interactive and Merrill Lynch, that produce computerized model sales prices for bonds, not the actual prices at which transactions occurred. (Tr. 515, Dr. Holmer Tr. 631). He did not know why the prices produced by these two services are not the same, or how an existing third service could produce another price (Tr.517–518). He was not aware of any historical data for actual trades for Z–Bonds that could be compared to the model prices to determine how accurate they are, and agreed that sale prices of securities on a given day are a better indication of fair market value.(Tr. 517). When advised that on three different dates the difference between Merrill Lynch's and FT Interactive sale prices deviated by 10, 7 and 45 percent, he could not explain the differences. (Tr. 521). His analysis did not include an adjustment for many of the Z–Bonds sold as odd lots. This type of security has a lower face value maturity or security and, generally, is sold for lower prices than higher face value securities. Many of the Z–Bonds Clover sold were odd lots.(Tr. 523, 524).

The court finds that Dr. Charron's testimony insufficient to prove Clover's sale of the Z–Bonds was imprudent and caused the combined proceeds received by the Funds to be approximately $720,000 below the market price for Z–Bonds on the dates of their sales. A trier of fact may reject testimony of a witness where he is not convinced of its merits. *Tyson v. Jones & Laughlin Steel Corp.*, 958 F.2d 756, 759 (7th Cir.1992).

Dr. Carron's quantitative analysis indicated that had the Z–Bonds not have been sold, but held to maturity, they would have out performed alternative investments.

Paragraph 9 of the DOL's complaint in it action against the trustees states:

The specific Z–Bonds purchased by the Defendant Trustees were a high risk, volatile class of security with a long weighted average life, whose market value was highly sensitive to changes in interest rates and the resulting changes in mortgage prepayment rates .... the Fund's Nolan portfolio was invested predominantly in Z–Bonds, placing the Plan's assets at inappropriate and unnecessary risk.

In spite of this ominous condemnation of overloading pension funds with Z–Bond investments, Dr. Carron testified that Clover should have kept the Z–Bonds, or sold them gradually, because his quantitative analysis showed that they would have out performed alternative securities. (TR. 195—210). This opinion overlooks the facts that there was no way to discover with certainty whether additional interest rate raises could have further depressed their market valuation, or if and when they might begin to recover; that continuing to hold them could constitute a lack of diversification violation under 29 U.S.C. § 1104(a)(1)(c); and that it would prevent Clover from carrying out the investment management plan that it had presented to the Funds' trustees, and which they were expecting to be establish forthwith.

Additionally, while Dr. Carron's hindsight projections indicated that the Z–Bonds would have out performed the securities purchased by Clover, in his deposition testimony of November 13, 2001, Steve Thomas, the Funds' actuary, stated that Clover's investments exceeded the Funds' 7½ % yield assumption from April 1, 1995 through March 31, 1999. (Thomas Dep. 122—124).

This court finds the defendant acted in conformity with the prudent man standard and therefore fully complied with its fiduciary obligations under 29 U.S.C.

§ 1104(a)(1)(B) and (D), and 29 U.S.C. § 1105(a)(2).

Accordingly, plaintiff's claims against the defendant are **DISMISSED** in their entirety..

Plaintiff's motion in Limine to Exclude Expert Testimony of Jon D Carlson w/exhibits 1 & 2, and Dr. Martin R. Holmer w/exhibits 1–3, were not argued prior to the trial and are made **MOOT** by this decision,

Plaintiff's motion in Limine to Admit Document into Evidence is **DENIED** as moot, the document was admitted into evidence and considered by the court in its deliberations,

Defendant's renewed motion to exclude the trial testimony of Dr. Andrew Carron is **DENIED**,

Defendant's motion for a directed verdict in its favor pursuant to Federal Rule of Civil Procedure 52(c), is **DENIED** as moot,

All objections made at trial regarding the admission of testimony and/or evidentiary exhibits into evidence are **DENIED**.

**IT IS SO ORDERED**