**Ray MARSHALL, Secretary of the United States Department of Labor, Plaintiff,**

v.

**GLASS/METAL ASSOCIATION AND GLAZIERS AND GLASSWORKERS PENSION PLAN, W. Thomas Finley, Douglas Masatsugu, Jose Tablada, Jr., Russell L. Choy, Jose Encarnacion, Howard H. Higa, William Roy Johnson and Robert S. Kaneshiro, Defendants.**

Civ. A. No. 80–0327.

United States District Court,
D. Hawaii.

Dec. 18, 1980.

Carin Ann Claus, Sol. of Labor, Monica Gallagher, Associate Sol. of Labor, Robert N. Eccles, Deputy Assoc. Sol. of Labor, Richard P. Carr, Atty., U. S. Dept. of Labor, Plan Benefits Security Division, Washington, D. C., for plaintiff.

Walter G. Chuck and Renton L. K. Nip, Walter G. Chuck & Associates, Honolulu, Hawaii, for defendants.

Robert E. Warner, Honolulu, Hawaii, Intervenor Grenco, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KING, District Judge.

Plaintiff Ray Marshall, the Secretary of Labor, brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against the Glass/Metal Association and Glaziers and Glassworkers Pension Plan ("Glaziers Pension Plan" or "Plan") and the individual trustees of the Plan. Plaintiff's amended complaint alleges that the individual defendants have breached their fiduciary duties under ERISA by committing the Plan to lend 23% of its assets to a company which intends to develop a time sharing project in the Makaha Valley of Oahu. The matter is before the Court on plaintiff's motion for a preliminary injunction to prevent the closing and disbursement of the loan. For purposes of this hearing only, the proposed borrower, Grenco, Inc., was permitted to intervene as a defendant.

Having heard the testimony and reviewed the exhibits introduced at the hearing on December 16, and 17, 1980, the Court now makes the following Findings of Fact and Conclusions of Law, pursuant to Rule 65(d), Fed.R.Civ.P.

## FINDINGS OF FACT

1. The Glaziers Pension Plan is a multi-employer pension plan established in 1971 in Honolulu, Hawaii, which is intended to provide pension benefits to participants who are or were members of Glaziers Local 1889. As of August 31, 1980, the Plan had assets totaling $3.288 million, most of which was invested in time certificates of deposit and in securities.

2. On November 19, 1979, Edwin K. Q. Yee submitted a proposal to the Glaziers Pension Plan, requesting a loan of $1.2 million on behalf of Grenco, Inc., a recently formed Hawaii corporation. The stated purpose of the loan related to the development of a time sharing real estate project in Makaha Valley, Hawaii, known as the Holiday Country Club. Of the $1.2 million in loan proceeds, $1 million was to be used to reduce certain mortgages on the property and to enable the borrower to acquire the property in fee simple; the remaining $200,000 was to be retained by the borrower as operating capital for the Holiday Country Club project.

3. The trustees of the Plan considered the Grenco, Inc., loan application at meetings held on December 17, 1979, December 27, 1979, and January 8, 1980. On January 16, 1980, they voted to reject the loan proposal. On February 12, 1980, the trustees reversed themselves and agreed to make the loan to Grenco, Inc., after the interest rate on the loan had been increased from 20% to 25%.

4. The Plan's loan commitment letter, dated February 12, 1980, and amended February 20, 1980, provided for a loan of $1.2 million to Grenco, Inc. The loan was originally scheduled to close on or before May 30, 1980. Defendant trustees, informally and then by stipulation in this lawsuit (brought on June 26, 1980), agreed not to transfer or disburse any loan proceeds until further notice to the Secretary of Labor. In July 1980, the trustees modified several terms of their loan commitment, chief of which was that the loan was reduced in amount to $750,001. In November 1980, the trustees advised the Secretary of Labor that they intended to proceed to closing on the modified loan. The Secretary then filed this Motion for Preliminary Injunction.

5. Holiday Country Club is the third and final phase of a project known as Holiday Plantation. Phases I and II of the Holiday Plantation were developed in the early 1970's by Holiday Mart, Inc., a corporation controlled, through family entities, by Edwin Yee. Construction on the project stopped in 1975, with 22 of the 149 planned units in Phase III completed. There has been no further construction since 1975, and some of the existing structures have deteriorated substantially due to lack of maintenance.

6. The property on which the Holiday Country Club project is to be completed, which would secure the Glaziers Pension Plan loan, is currently owned by Loyalty Development Company, Ltd. This company is a Hawaii corporation that bought the property in March 1977 for $500,000 from Holiday Plantation. H.C.C. Resorts, a limited partnership of which Holiday Mart, Inc. is general partner, has leased the land since that time. Also in March 1977, as part of an overall settlement, H.C.C. Resorts obtained a $3.5 million mortgage loan from Loyalty Investments, a limited partner, to repay certain prior indebtedness on the property. This loan was guaranteed by Holiday Mart, Inc., Edwin Yee, Ltd., and Mr. Yee and his wife, jointly and severally. Since March 1978 the loan has been in default, and Loyalty Investments has instituted foreclosure proceedings, which remain pending.

7. Holiday Mart, Inc., the developer of the Holiday Country Club project, encountered serious financial difficulties, and in December 1977, it filed a petition for relief under Chapter XI of the Bankruptcy Act. Subsequently, an involuntary petition for bankruptcy was filed (but not perfected) against H.C.C. Resorts, the lessor of the Holiday Country Club property. Holiday Mart, Inc. was adjudicated a bankrupt on December 5, 1980. The loan transaction at issue here was designed, at least in part, to resolve some of the claims raised in these

bankruptcy proceedings and also to extricate the fee simple interest in the Holiday Country Club property from the bankruptcy proceeding.

8. Under the terms of the amended loan commitment, the Glaziers Pension Plan would loan Grenco, Inc. $750,001 for a term of 18 months. The interest rate on the loan is 25% per year, with semi-annual interest payments of $15,000. The security on the loan is to be a first mortgage on the Holiday Country Club property. The shareholders of Grenco, Inc., the sons of Edwin Yee, are guarantors on the loan and have entered into a "negative pledge" not to further encumber certain real estate which they own.

9. Repayment of the Glaziers Pension Plan loan is intended to be made from the proceeds of a construction loan from State Savings and Loan Association ("State Savings"). This loan commitment, issued on December 18, 1979, provides for a two-year loan of the lesser of $4 million or 75% of the appraised value of the property, with interest at 2.5% over prime. The borrower also must pay a total of $40,000 in commitment fees and $80,000 as a loan origination fee.

10. The State Savings loan commitment significantly, also requires that the borrower, prior to closing, sell for cash not less than $4 million in time share certificates for the Holiday Country Club project and deposit this cash in escrow with State Savings and Loan. If the cash pre-sales requirement is not met prior to December 31, 1981, the closing date, the loan commitment expressly provides that State Savings shall have no obligation to fund the loan.

11. According to the loan proposal submitted to the Glaziers Pension Plan, each of the 149 apartment units in the Holiday Country Club project will be offered for sale for 51 weeks, or time frames, for a total of 7,599 time frames. The first 2,000 of these time frames would be sold without sales commissions and at a discount price of $2,950 cash. The remaining time frames would be offered later at higher prices. The prospective purchasers of the time sharing units are expected to be residents. of Oahu, as distinct from tourists.

12. If the Plan's loan to Grenco, Inc. is closed, a complex chain of transactions would be set in motion which would have the following net effects: The Plan loans Grenco, Inc. $750,001 and takes back a first mortgage on the Holiday Country Club project, plus the guarantees of Mr. Yee's sons. Grenco, Inc. purchases a 25% interest in H.C.C. Resorts and replaces Holiday Mart, Inc. as the general partner of H.C.C. Resorts. Loyalty Investments and Loyalty Development Company, Ltd. receive promissory notes and second and third mortgage interests in the property for $2.75 million and $500,000, respectively; Loyalty Investments also receives $1.35 million in cash (including the $750,001 loan proceeds), in repayment of prior mortgage indebtedness. Holiday Mart, Inc., which is currently in Chapter VII bankruptcy proceedings, has between $3 million and $4 million in contingent liabilities removed.

13. The proposed loan to Grenco, Inc. represents a commitment of approximately 23% of the Plan's assets to a single, speculative real estate venture. The risk inherent in the loan is accentuated by a variety of factors, including the previous failure of the project, the financial problems affecting the borrower's principal, the uncertain concept and plan of marketing time sharing units, and the inexperience of defendant trustees in making loans.

14. Prior to approving the loan to Grenco, Inc., the trustees had never invested Plan assets in a real estate loan, and they had little or no personal experience in lending or finance. While the trustees did receive legal advice concerning the Grenco, Inc. loan, they themselves made the investment decision, relying in large part upon information and opinions provided by the borrower.

15. Plaintiff's expert witness, Joseph Azrack, testified that an experienced lender would have analyzed this loan by looking at the following factors: 1) the borrower's financial capability and track record; 2) the market for the project to be financed by the loan; 3) the economic feasibility of the

project; 4) the value and liquidity of the collateral for the loan; and 5) the existence and availability of other financing as a source of repayment for the loan.

16. The proposed borrower, Grenco, Inc., is a shell corporation of the type commonly used by developers. While its principals have other assets that they may be willing to contribute to this project, the Plan's commitment provides no assurance that additional capital, if needed, will be forthcoming. The principal force in Grenco, Edwin Yee, has had a successful record as a developer in Hawaii, except for his prior experience at Holiday Plantation. Notwithstanding his past successes, Mr. Yee has been unable to find financing for this project for several years. As his attorney asserted at trial, Mr. Yee is under pressure from the Loyalty firms, the property's current owner and leasehold mortgagee, to obtain the financing or face foreclosure.

17. Witnesses for both sides testified that the success of the project could vary widely, depending on the success of the sales and marketing efforts. The marketing information provided to the Plan was sketchy, reflecting largely the natural optimism of a developer and salesman. Because the marketing concept involved, the sale of time shares in local property to local residents, was completely untried, an experienced lender would probably have required that the existence of the market be proven by the pre-sale of a certain number of units. Indeed, State Savings required not only such pre-sales, but also that the cash from the pre-sales be deposited with it. While it may be true, as Grenco, Inc. asserts, that it cannot pre-sell units unless it obtains the loan and acquires the property, that is not a consideration which should bind the Pension Plan; if an experienced lender were not satisfied that a market existed, it would not make the loan.

18. The economic feasibility of a project which seeks to rejuvenate a development that has been sitting in a state of partial completion for five years is difficult for even an experienced lender to evaluate. A knowledgeable witness called by defendants testified that until new construction actually began, the full extent of any deterioration—and thus, the total costs of construction—could not be known. An experienced lender would nonetheless have attempted to evaluate the probable construction costs and compare them with market information to determine whether the project was likely to succeed. The Plan trustees made no such evaluation.

19. The property which would be security for the Plan's loan was appraised by reputable appraisers at between $3.4 and $4 million on an "as is" basis. Plaintiff's expert testified that, even with this appraisal value, an experienced lender would not necessarily make the loan if it had doubts about the success of the project; a lender plainly does not want to take on needlessly the headaches and uncertainties of foreclosure. As the property's appraiser testified, there is no established market for partially completed condominium projects, and the value existing in the property may or may not be obtainable in the event of further distress to the property or an additional foreclosure. Similarly, the guarantees of Mr. Yee's sons may have some value, but they do not assure the Plan of timely or even complete repayment.

20. Finally, the existence of the State Savings loan commitment affords little protection to the Plan. The State Savings commitment is contingent upon a number of conditions which generally relate to State's determination of whether the project appears likely to be successful. If the borrower's plans are successful, there will be no question about repayment of the Plan's loan. If, however, the borrower runs into difficulties, the precise circumstances under which the Plan would be looking for a source of repayment, then it is likely that State Savings will invoke certain conditions to its commitment and decline to fund the loan.

## CONCLUSIONS OF LAW

1. The Glaziers Pension Plan is an employee benefit plan within the meaning of Section 3(3) of ERISA, 29 U.S.C. 1002(3),

and therefore subject to coverage of ERISA under Section 4 of ERISA, 29 U.S.C. 1003. The individual trustees are fiduciaries with respect to the Plan within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. 1002(21)(A).

2. The Secretary of Labor has standing to maintain this action under Section 502(a)(2) and (5) of ERISA, 29 U.S.C. 1132(a)(2) and (5). Jurisdiction and venue in this Court are proper pursuant to Section 502(e)(1) and (2) of ERISA, 29 U.S.C. 1132(e)(1), (2).

3. ERISA is "the product of several years of legislative effort to improve the American pension system". *Connolly v. PBGC*, 581 F.2d 729, 731 (9th Cir. 1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979). Among its purposes are the protection of the interests of participants and beneficiaries of pension and welfare benefit plans and preservation of the integrity of plan assets. *Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978); *see Nachman v. PBGC*, 446 U.S. 359, 361–2 & n.1, 100 S.Ct. 1723, 1726–27, 64 L.Ed.2d 354 (1980).

4. Section 404(a)(1)(A)–(C) of ERISA, 29 U.S.C. 1104(a)(1)(A)–(C), provides as follows:

A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expense of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investment of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. . . .

These provisions of the Act establish uniform federal requirements to be interpreted both in the light of the common law of trusts, as well as with a view toward the special nature, purpose, and importance of modern employee benefit plans. *Marshall v. Teamsters Local 282 Fund*, 458 F.Supp. 986, 990 & n.8 (E.D.N.Y.1978). If a trustee or other plan fiduciary breaches any of his fiduciary obligations under ERISA section 404, he may be sued by the Secretary of Labor or other persons, and may be subjected to personal liability for losses to the plan and to all other appropriate equitable relief, including injunctive relief. *See* ERISA sections 409, 502(a)(2), (5), 29 U.S.C. §§ 1109, 1132(a)(2), (5).

5. In fashioning the diversification provision of section 404(a)(1)(C), Congress chose not to legislate a specific percentage limit on any one investment. Instead, it imposed a requirement of diversification that depends upon the facts and circumstances surrounding each plan and investment. The fact that some flexibility is allowed in determining diversification, however, does not in any way lessen the significance of the requirement. In traditional trust law, the duty to diversify was considered to be merely one aspect of the trustee's duty of prudence. In contrast, both Congress and the courts have recognized that the diversification requirement of ERISA section 404(a)(1)(C) imposes a separate duty on plan fiduciaries to spread the risk of loss to the plan. The Conference Report on ERISA sets forth a number of factors which should be considered by a plan fiduciary and explains:

A fiduciary usually should not invest the whole or unduly large proportion of the trust property in a single security. Ordinarily the fiduciary should not invest the whole or an unduly large proportion of the trust property in one type of security or in various types of securities dependent upon the success of one enterprise or upon conditions in one locality, since the effect is to increase the risk of large losses. . . . If he is investing in mortgages on real property he should not invest a disproportionate amount of the trust in

mortgages in a particular district or on a particular class of property so that a decline in property values in that district or of that class might cause a large loss. H.R.Rep.No.1280, 93d Cong., 2d. Sess. 304, U.S.Code Cong. & Admin. News 1974, 5038, 5085 (1974) ("Conference Report").

■ 6. Both on its face and according to the standards of experienced lenders, a commitment of 23% of the Glaziers Pension Plan's total assets to a single loan subjects a disproportionate amount of the trust assets to the risk of a large loss. The Conference Report makes clear that once the plaintiff has proved that non-diversification exists, the burden shifts to the defendants to justify their failure to diversify. Conference Report, at 304. The burden is not merely to prove that the investment is prudent, but that there is no risk of large loss resulting from the non-diversification. Here, the defendants have not provided proof necessary to meet this heavy burden. To the contrary, the special risks inherent in this loan make the need for diversification even more apparent. Accordingly, the Court concludes that the loan, if consummated, would violate 29 U.S.C. § 1104(a)(1)(C).

■ 7. In addition to their duty to diversify plan assets, the defendants are also required by ERISA to conduct their activities as would a prudent man under similar circumstances. The Plan trustees have defended the prudence of their conduct by emphasizing that they sincerely believed that their actions were in the best interests of the Plan and that they should not necessarily be held to standards applicable to large lending institutions or even large pension plans. The sincerity of the trustees' beliefs was not questioned in the hearing, but it is essentially irrelevant to a determination of the prudence of their conduct. While there is flexibility in the prudence standard, it is not a refuge for fiduciaries who are not equipped to evaluate a complex investment. If fiduciaries commit a pension plan's assets to investments which they do not fully understand, they will nonetheless be judged, as provided in the statute, according to the standards of oth-ers "acting in a like capacity and familiar with such matters."

8. The defendants and Grenco have also vigorously defended on the ground that the real estate project which would be financed through the Plan's loan may be a highly successful and profitable venture which would provide a high rate of interest to the Plan, as well as job opportunities for construction workers and recreational facilities for residents of Oahu. It may indeed be true that these events would come to pass, and there is evidence to suggest that they would occur. However, the job of the trustees in this situation is not to adopt the borrower's enthusiasm for his project, but to evaluate the prospective risks and returns to the Plan.

■ 9. ERISA does not require that a pension plan take no risks with its investments. Virtually every investment entails some degree of risk, and even the most carefully evaluated investments can fail while unpromising investments may succeed. The application of ERISA's prudence standard does not depend upon the ultimate outcome of an investment, but upon the prudence of the fiduciaries under the circumstances prevailing when they make their decision and in light of the alternatives available to them.

■ 10. The evidence shows that the Plan trustees, lacking prior lending experience, failed to follow the procedures that a prudent lender would utilize and thus did not perceive the dangers to which they were exposing the Plan. They also gave no consideration to other real estate investment vehicles, such as commingled funds or mortgage pools, which, according to expert testimony, offered greater opportunity for diversification and assurance of a steadier return. By committing Plan assets without adequate procedures and evaluation of the risks involved and alternatives available, defendants violated their duty to act with care, skill, prudence, and diligence, as required under 29 U.S.C. § 1104(a)(1)(B).

11. The evidence also shows that the Plan would assume considerably greater

risk than the other entities and lenders associated with this development project, without concomitant return. If the Plan's loan closes, Loyalty Investments would receive $1.35 million in cash and still retain an equity position through a limited partnership interest in H.C.C. Resorts. State Savings and Loan Association would receive $40,000 for a commitment that it will probably not have to fund. Mr. Yee, through Grenco, will obtain the financing, which he has apparently been unable to find elsewhere, to remove this property from bankruptcy, reduce liabilities in the Holiday Mart, Inc. bankruptcy, and even gain substantial profits from a successful development. The Glaziers Pension Plan, on the other hand, will obtain only the right to receive a total of $30,000 in interest payments over an 18-month period. The Plan thus assumes most of the risks but few of the potential rewards of an equity position in the project.

12. If all goes well, the Plan would receive a relatively high, short-term return. The possibilities that the project will not succeed, however, are significant. The marketing and development could fail for many reasons, such as lack of operating funds, unanticipated costs involved in restoring the uncompleted buildings, or simply the fact that market demand may not exist. If that occurs, the Pension Plan, at the end of the 18-month term of the loan, would have a loan totalling almost one million dollars in principal and accrued interest. It would then face the costs and headaches, which it is not equipped to handle, of taking over, or disposing of in an uncertain market, a partially completed project which had again failed as a development.

13. In short, this proposed development may well turn out to be a worthwhile, profitable project for another lender to finance. Under the existing circumstances, however, it is not a prudent investment for this pension plan, and the Court thus finds that the trustees have violated their statutory duty of prudence under 29 U.S.C. § 1104(a)(1)(B).

14. In view of the Court's conclusion that the trustees have violated ERISA, it is clear that the Secretary has sustained his burden of showing that he has a probability of success if this action is ultimately tried on the merits. *Hawaii Psychiatric Society v. Ariyoshi*, 481 F.Supp. 1028, 1036 (D.Hawaii 1979). In addition, the balance of hardship tips sharply in favor of protecting the Pension Plan against the dissipation of its assets. The guiding concern of the Court is to adopt the remedy which best protects the interests of the participants and beneficiaries of the Plan. *Eaves v. Penn, supra; Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629 (W.D.Wis.1979). Injunctive relief is plainly authorized by the statute, and it is appropriate here to protect the Plan and its assets. 29 U.S.C. §§ 1109, 1132(a)(2) and (5); *see Marshall v. Local 282 Pension Fund, supra*.

Accordingly, plaintiff's Motion for a Preliminary Injunction is granted, and a preliminary injunction will issue.