**Richard DELK and Harold Ramsey, on behalf of themselves and as representatives of the class herein defined (94–6259); Jerry Arthur, Wendell Rose, Patricia Wright and Steve Wright, on behalf of themselves and as representatives of the class herein defined (94–6261), Plaintiffs–Appellants,**

v.

**FORD MOTOR COMPANY; Ford–UAW Supplemental Unemployment Benefit Plan; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America–UAW (94–6259/6261); Leland Jackson; Ronald Gettlefinger; Pat Pellilo; Medford Lee, individually and as members of defendant, Ford UAW Supplemental Unemployment Benefit Plan Local Committee; Joint Board of Administration of the Ford–UAW Supplemental Unemployment Benefit Plan (94–6261), Defendants–Appellees.**

Nos. 94–6259, 94–6261.

United States Court of Appeals,
Sixth Circuit.

Argued May 14, 1996.
Decided Sept. 16, 1996.

Schuyler J. Olt (argued and briefed), Pedley, Ross, Zielke & Gordinier, Louisville, KY, for Plaintiffs-Appellants in No. 94-6259.

Samuel Manly (argued and briefed), Louisville, KY, for Plaintiffs-Appellants in No. 94-6261.

Kimberly K. Greene (argued), Holly Thacker, Michael Keith Kirk, Wyatt, Tarrant & Combs, Louisville, KY, John M. Thomas, Ford Motor Company, Dearborn, MI, Edgar A. Zingman (briefed), Wyatt, Tarrant & Combs, Louisville, KY, for Defendants-Appellees Ford Motor Company, Ford-UAW Supplemental Unemployment Benefit Plan, Leland Jackson, Ronald Gettlefinger, Pat Pellilo, Medford Lee, Joint Board of Administration of Ford-UAW Supplemental Unemployment Benefit Plan.

Herbert Segal (argued and briefed), Adrienne A. Berry, Segal, Isenburg, Sales, Stewart, Cutler & Tillman, Louisville, KY, Kimberly K. Greene, Holly Thacker, Michael Keith Kirk, Wyatt, Tarrant & Combs, Louisville, KY, John M. Thomas, Ford Motor Company, Dearborn, MI, for Defendant-Appellee International Union, United Automo-

bile, Aerospace and Agricultural Implement Workers of America–UAW.

Before: NELSON and MOORE, Circuit Judges; CLELAND, District Judge.*

CLELAND, District Judge.

These two consolidated class actions challenge the administration of the Supplemental Unemployment Benefit Plan ("SUB Plan"), part of the collective bargaining agreement between Ford Motor Company and the UAW. The Appellants are or were hourly paid UAW union members employed by Ford during the late 1970s and the early 1980s, when Ford and other American automobile manufacturers were experiencing a financial crisis, in part as a result of pressure from foreign competition. The Arthur Appellants worked at Ford's Louisville Assembly Plant, and the Delk Appellants worked at the Kentucky Truck Plant. Both challenge the administration of the SUB Plan during this time of financial difficulty, particularly in relation to the Trade Readjustment Allowances provided under the Federal Trade Expansion Act of 1962. The issues presented by the Delk Appellants are whether the district court applied the proper standard of care applicable to the fiduciary-employer of an ERISA-governed plan designed to provide benefits to workers laid off by the employer and whether they have standing to recover benefits directly to them, as opposed to the SUB Plan. The Arthur Plaintiffs ask this court to determine that Ford breached the SUB Plan by failing timely to notify the them of overpayments of SUB benefits before it acted to recoup those overpayments. After examining the district court's exceptionally thorough Findings of Fact and Conclusions of Law, we find no error and affirm.

## I.

Appellants do not challenge the district court's findings of fact, but a review of the rather complex factual background in which this case arose is necessary to an understanding of the issues raised on appeal. Ac-

cordingly, we set forth the background facts at length here.

The SUB Plan is a benefit provided in the collective bargaining agreement between Ford and the UAW. As its name implies, the SUB Plan offers eligible laid off workers extra unemployment benefits during temporary production downturns, to supplement state or federal unemployment benefits. SUB Plans were created in the UAW's 1955 collective bargaining agreement with Ford, General Motors, and Chrysler. The Ford SUB Fund is funded solely by contributions from Ford based on a formula set forth in the Plan.

Employees accumulate credit units based upon actual weeks worked up to a maximum of 52 credits. When employees are laid off, they surrender credit units to receive SUB benefits. The number of credit units required to obtain a benefit for any given week is a function of the level of the Fund, the credit unit cancellation base and the employees' seniority. As the SUB Fund level and the credit unit cancellation base decrease, less senior employees surrender more credit units than more senior employees. If the credit unit cancellation base drops below a level set forth in the Plan, employees with less than 10 years' seniority are not entitled to any SUB benefits.

An employee has no unqualified right to receive SUB benefits; the SUB Plan expressly states that "No person shall have any right, title or interest in or to any of the assets of the Fund...." Nevertheless, to the extent that funds are available, an eligible laid off employee is entitled to receive—and Ford is obligated to pay—SUB benefits. The employee's benefit is "an amount which, when added to his State Benefit and Other Compensation, will equal 95% of his Weekly After–Tax Pay minus $12.50....."

The Plan expressly includes as a "state" benefit Trade Readjustment Allowances provided under the Federal Trade Expansion Act of 1962 ("TRA"). TRA is a benefit payable to certain eligible workers laid off be-

---

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michi-

gan, sitting by designation.

cause of declining sales due in significant part to competitive imported products. 19 U.S.C. § 2271 *et seq.* (West 1980).

In order for TRA to have any impact on a laid off worker's SUB benefit, it must be "received or receivable." Otherwise, TRA cannot be taken into consideration in deciding the amount of SUB to which a laid off employee is entitled. The same is true of any "State Benefit or Other Compensation." In other words, unless and until TRA is "received or receivable," an employee is contractually entitled to a SUB payment calculated without reference to that "state" benefit; for purposes of the SUB Plan, it is as if the TRA benefit does not exist until it becomes "received or receivable."

For TRA to be awarded, a group of three employees, or the employees' authorized representative, must petition the United States Department of Labor ("Labor") for certification of a plant. The test for certification is whether, in Labor's determination, "increases of imports of articles like or directly competitive with articles produced by" the plant have "contributed importantly to" layoffs and declines in production or sales at that facility. 19 U.S.C. § 2272 (West 1980). If certification is granted, Labor sets an "impact date," *i.e.*, the date on which layoffs due to foreign competition are deemed to have begun. Once Labor certifies a plant, the process is turned over to the relevant state unemployment insurance agency to receive, process and, if warranted, pay claims for TRA benefits filed by individual plant workers. 19 U.S.C. § 2311 (West 1980). While Labor makes the determination as to whether a plant should be certified for TRA, state unemployment agencies decide whether a particular employee at the plant is eligible for TRA and, if so, for which weeks.

Although Labor may certify a plant, not all employees at that plant may be eligible to receive TRA benefits. First, Labor may issue only a partial certification, in which some—but not all—of the vehicles or parts made at that site are certified as being impacted by imported goods. Thus, laid off employees in those plants who do not work on certified products are ineligible for TRA. Second, even workers on certified products are not eligible for TRA if they fail to meet Labor's "26 week test," which requires that the employee work a total of 26 weeks in the prior 52 weeks on a certified product, and receive a certain specified level of wage. Based on his earlier experience with TRA from 1975 to 1979, Leonard Page, Associate General Counsel for the UAW, estimated that 10 to 20% of the workers at a certified plant would be found ineligible for TRA benefits.

In 1979, Ford, General Motors and Chrysler began laying off tens of thousands of employees due to a downturn in automobile and truck sales in the United States caused in part by increasing foreign competition. Pursuant to the SUB Plans in effect at the three companies, laid off UAW workers made applications for and received benefits from the SUB Funds.

In the summer of 1979, Leonard Page, the UAW's unofficial Trade Act Coordinator, began to contemplate the possibility of obtaining TRA benefits for UAW members nationwide. The UAW traditionally filed TRA petitions on behalf of its members, and viewed this as its responsibility. The UAW's goal, of course, was to gain maximum benefits for all affected UAW members.

However, Page and the UAW were concerned about the viability of an industry-wide TRA petition. In previous experiences with TRA, there was litigation between the UAW and Labor over whether the large American-made cars could ever be "like or directly competitive with" imported subcompacts. In 1975 and 1977, Labor analyzed TRA petitions using a market segment approach and certified primarily U.S. plants that manufactured subcompact or small luxury cars (*e.g.* Bobcats and Pintos at Ford). In those years, Labor refused to certify approximately 70% of the Ford and Chrysler plants and approximately 90% of the GM plants.

Labor's market segment approach also made it difficult to obtain certification for parts plants. Parts plants typically produced parts for all sizes of cars; to obtain certification for all or a portion of a parts plant, the UAW had to show that some or all parts produced there were ultimately included in a

car manufactured by an assembly plant which was certified for TRA. Thus, few parts plants were certified before 1979.

In late 1979, knowing that it faced an uphill battle, the UAW decided not to go with a massive, industry-wide petition but, rather, to present Labor first with the worst-case scenario: Chrysler. Chrysler had experienced the worst layoffs of the Big 3 automakers—its SUB Fund was virtually depleted and the company was in dire financial straits. This data would make the strongest case of injury to the truck and midsize and luxury car markets from smaller imported vehicles. If Labor granted the Chrysler petition, it would establish a precedent that larger model cars and trucks were "like or directly competitive with" smaller, import models. At that point, Labor would be hard pressed to deny certification to Ford or GM plants that made similar size and model vehicles.

At the same time that the UAW was formulating its "Chrysler First" strategy, from July through October of 1979, Ford's SUB Fund was under special scrutiny by Ford and the UAW as they negotiated a new collective bargaining agreement. F.E. Becker, the SUB Fund Analyst in Ford's Finance Department, used a computer model to cost out the potential UAW demands concerning the SUB Plan, taking into account the current Fund level and projected layoffs. At no time during the negotiations did Becker's model show that the Fund would be unable to meet the benefit demands of laid off workers, and the UAW was satisfied that the SUB Fund would survive any demands based on the projected economic outlook.

Even after the negotiations ended, Becker continued to prepare projections of SUB Fund levels based upon Ford's vehicle production plans and monthly reports of SUB applications made and benefits. His December 1979 projection showed that the SUB Fund would contain $125.3 million in assets by December 1980, which equated to 41% of maximum funding, a healthy fund.

On November 6, 1979—when Ford was still projecting a healthy fund through December of 1980—Labor certified all but one of the plants in the UAW's Chrysler mass petition. The UAW was surprised by the scope of its success. Now knowing the potential scope of certification, UAW immediately commenced work on petitions for Ford and GM plants. Collecting the necessary information and data for the Ford and GM petitions was a massive undertaking. UAW plant representatives gathered data, with assistance from Ford, and provided Page with all the information he requested to complete the petition.

Several events required Page to postpone filing the petitions until late January 1980. First, layoffs at Ford and GM continued to increase, and Page repeatedly amended the draft petitions to include the new data. Second, in January 1980, Page called Marvin Fooks at Labor to notify him that the GM and Ford petitions would soon be filed. Fooks told Page that a major problem in Labor's investigation of the Chrysler petition was gathering sufficient data to determine which parts plants should be certified. Fooks asked Page to provide such data to Labor in the Ford and GM petitions; Fooks specifically instructed Page to file comprehensive petitions and not to "piece-meal" him.

The UAW filed the Ford petition on January 30, 1980. The Ford petition sought certification of 59 Ford plants, including the Louisville Assembly Plant and the Kentucky Truck Plant.

In February 1980, the month after the Ford TRA petition was filed, Becker's forecasts still showed that the SUB Fund would remain healthy and able to satisfy the benefit applications of eligible workers, notwithstanding increasing numbers of layoffs. Ford's economic forecasts and projections were as accurate, if not more so, than those of any other automaker. Indeed, the mid-February production program called for an increase in production activity and a corresponding decrease in layoffs; it was also anticipated that as many as 4,500 employees (approximately 10% of those then on indefinite layoff) would be recalled. In fact, Ford recalled 2,500 employees in February of 1980.

However, the March 1980 production program presented a much different picture—a

precipitous decrease in production of 300,000 units, and a corresponding increase in lay-offs. Becker's March 27, 1980 projection, based on this dramatically different production program, forecast that the SUB Fund could become depleted by August 1980.

In March, UAW and Ford representatives met to discuss ways to accelerate the ability to offset TRA from SUB, if Labor certified Ford plants, thereby minimizing payouts from the SUB Fund. Under the UAW–Ford Collective Bargaining Agreement, no changes in SUB Plan terms could be made during the life of the Agreement; however, Ford and the UAW could jointly interpret SUB Plan provisions. Under the express terms of the SUB Plan, TRA could not be taken into account in computing SUB benefits unless and until it was "received or receivable." Until then, an eligible employee was contractually entitled to a SUB benefit calculated without reference to any potential TRA.

The term "received or receivable" is not defined in the SUB Plan. Historically, Ford and the UAW had interpreted the term to mean that time when an individual employee had made an application for TRA for the same week he or she was seeking SUB, and had either received a TRA payment or was about to do so. This definition of "receivable" was too restrictive in the context of TRA payments. The Trade Act contained no deadline for when an employee must apply for TRA (or, indeed, any requirement that an application be made at all), and employees receiving SUB benefits had little incentive to apply for TRA. Thus, under the old interpretation of "received or receivable," Ford could be prevented from offsetting TRA from SUB indefinitely, since each employee was actually required to apply for TRA before TRA could have any effect on his or her SUB payments.

On the other hand, experience had shown that there was likely to be a lag between the date on which a plant was certified for TRA and the date on which benefits would be received—if at all—by individual workers. Typically, approximately 10–20% of workers at a certified plant would be ineligible for TRA because of partial certifications and the "26 week test." Further, it usually took months for the state agencies to gear up to accept TRA applications and to be in a position to pay TRA benefits. Therefore, if TRA benefits were deemed "receivable" when a plant was certified, SUB benefits, upon which laid off workers depended to replace their lost salaries, would be reduced or eliminated because of TRA benefits that might be delayed for many months—or never paid at all. In short, if benefits were deemed "received or receivable" too late, employees would enjoy double benefits at the expense of the fund (and, therefore, some fellow employees). On the other hand, if benefits were deemed "received or receivable" too soon, workers might have a lapse in benefits. To complicate the matter, workers had no obligation to inform the fund when they received TRA, and, in fact, they had an incentive to conceal that information in order to impede recoupment of overpayments.

On April 8, 1980, Ford and the UAW entered into the Ryder–Bannon Agreement, which reinterpreted the term "receivable" in a way that would help conserve SUB funds if Ford plants were certified without creating hardships for laid off workers. The Ryder–Bannon Agreement provided, in pertinent part:

> When employees have been certified as eligible for TRA, [Ford] will do everything possible to provide the state agency involved with payroll data required to facilitate processing of claims and payment of TRA benefits and otherwise cooperate with the state agency. Based on a reasonable time for filing applications and the time the state agency requires to process claims, a date will be established by the SUB Board of Administration for taking account of TRA which employees at each location are eligible to receive in the calculation or recalculation of SUB benefits. The SUB Board of Administration shall closely monitor the performance of the state agencies with the objective of avoiding any interruption in TRA benefits to the extent possible. Upon the date(s) established by the SUB Board of Administration, SUB will be reduced for all employ-

ees at each certified location eligible for TRA.

Thus, under this Agreement, TRA benefits were deemed "receivable" by an eligible employee once the state agency was able to process and pay promptly any TRA claims, regardless of whether he or she had actually made a claim for TRA. Ford could deduct the value of TRA benefits from SUB payments without waiting until an employee actually applied for TRA benefits, but laid off workers would receive full SUB benefits (to the extent allowed by the SUB Plan) until TRA benefits were actually available to them. The effect of this agreement was to give incentive to TRA-eligible employees to apply for them. If they did not, their SUB benefits would be reduced by the amount of TRA they would have received if they had applied.

On April 17, and April 25, 1980, Labor certified that some employees at the Louisville Assembly Plant and 56 other Ford plants (not including the Kentucky Truck Plant) would be eligible to apply for TRA. The "impact date" for the Louisville Assembly Plant was set retroactively at January 30, 1979, one year prior to the date of the petition. This retroactivity further compounded the SUB Plan's difficulties; the Trade Act has since been amended to eliminate the possibility of retroactive impact dates.

As a result of this retroactive certification, certain employees who had been laid off after January 30, 1979, (including the Arthurs) would be eligible for TRA benefits for weeks of layoff for which they had already received SUB and state unemployment benefits equal to 95% of take-home pay. Once TRA benefits for those weeks became "receivable," some of the SUB payments made for those same weeks would become overpayments. Under the terms of the Plan, if Ford determines that an overpayment has occurred, it has the right to recover that amount from the employee if it provides written notice thereof to the employee within 120 days after the overpayment is "established or created."

When Labor certified the 57 Ford plants on April 17 and 25, 1980, the relevant state unemployment agencies were not yet in a position to process and pay TRA claims. Be-

cause Ford did not yet know which employees would receive what amounts of TRA, no actual overpayments could be established and Ford could not begin recouping SUB overpayments from laid off workers under the Plan terms. As a result, laid off employees continued to receive the full amount of their SUB benefits for weeks after January 30, 1979, without deduction for TRA.

On June 30, 1980, as a result of benefit payments to over 75,000 laid off workers, the SUB Fund dropped to its lowest level ever. The SUB Plan itself contemplates precisely this situation, where a heavy demand for benefits during a time of extraordinary layoffs temporarily depletes the Fund's assets. In these circumstances, benefit payments are reduced or eliminated depending upon the severity of the depletion and the employee's seniority. However, the Plan also requires Ford to increase the amount of its regular contributions as the Fund balance decreases, in order to restore the Fund quickly to a healthy funding level.

A large number of hourly workers at the Kentucky Truck Plant, including most members of the Delks' class, were laid off on July 25, 1980. From that date for approximately three and one-half months, laid off Kentucky Truck Plant workers with less than ten years' service (like their counterparts at other Ford plants) received no SUB payments due to the level of the Fund.

By continually monitoring the progress and funding status of the state unemployment agencies, the SUB Board of Administration determined that by August 4, 1980, the Unemployment Division of Kentucky was in a position to process and promptly pay TRA applications upon receipt. The Joint Board is a six-member body; three members are appointed by Ford, and three are appointed by the UAW. Thus, pursuant to the Ryder–Bannon Agreement, TRA benefits were presumed to be "receivable" after August 4, 1980, by Ford employees in Kentucky who were receiving or had received SUB from January 30, 1979 forward. Kentucky was able to make a handful of TRA payments August 4, 1980, but federal funding for TRA temporarily dried up almost immediately. Patricia Wright, one of the Arthur Plaintiffs,

received her first TRA check on May 14, 1980. The evidence indicates that this check was the first received by any class member.

As a result, some part of the SUB payments made to Kentucky employees for weeks after January 30, 1979, although contractually required when made, later became overpayments. Under the Plan, if Ford determines that a SUB overpayment exists, it may recoup that amount from the employee provided that "written notice thereof" is given to the employee within 120 days from the date that the overpayment was "established or created." An employee has the right to appeal a notice of overpayment to the SUB Joint Board of Administration. If no appeal is filed, or if the determination is upheld, then the employee must return the amount to the Plan. If an employee fails to return any overpayment as required by the Plan, then the company can recoup the amount by making deductions from future SUB payments (not to exceed $20 per week) or from future salary (not to exceed $30 per week). The recoupment process requires three things: (1) the company must determine that an overpayment exists; (2) a written notice of the amount of the overpayment must be sent to the employee; and (3) notice of the amount of the overpayment must be sent within 120 days of the date on which the overpayment was "established or created."

There were no viable alternatives to recoupment other than following the express terms of the Plan. In previous litigation involving Ford and the UAW in which Ford sought to recover overpayments, the court had ruled that the SUB Plan provisions were the exclusive mechanism by which the company could collect overpayments. *Soboleski v. Ford Motor Co.*, No. 76–2240, Slip. Op. (D.N.J. March 11, 1977). Additionally, in the mid-seventies, the UAW asked Labor whether TRA benefits could be paid directly to the SUB Fund, thus avoiding the recoupment process entirely. The Solicitor for Labor expressly refused to pay TRA to anyone (including the UAW) other than the particular individual entitled to receive the benefit.

Ford promptly set about determining whether an employee's receipt of retroactive TRA would result in a SUB overpayment (and, if so, the amount of the overpayment) so that those individuals could be notified of the amount they owed to the Fund. To do so, Ford had to determine the amount of TRA received by each employee as well as the layoff weeks to which each payment was attributable. Ford asked the various state agencies to supply this information, but the agencies refused on the ground that divulging information about a particular employee would violate his or her privacy rights. Consequently, Ford had to devise a computer program to reconstruct the computations made by the state agencies. Using this program, Ford's central data processing center attempted to determine whether an individual was eligible for TRA, and, if so, the amounts of TRA and the weeks for which TRA was receivable. This information was compared to the amounts and weeks of SUB received by that employee to establish whether he or she had been overpaid from the SUB Fund as a result of the retroactive TRA benefits.

The data processing center completed calculations for the Louisville Assembly Plant employees by the third week of August, 1980. Within one week, the overpayment notices were shipped to the Louisville Assembly Plant with instructions to the personnel department to send them to employees by certified or registered mail immediately upon receipt. The Arthur Plaintiffs received their overpayment notices by September 9, 1980. Even before the formal notices were sent out on September 5, 1980, most employees were aware of their obligations to repay TRA-generated SUB overpayments. The UAW and Ford had conducted campaigns designed to notify the employees of their repayment obligations. Literature concerning the topic was circulated among Ford employees during the spring and summer of 1980. On April 23, 1980, the UAW sent a notice to all Louisville Assembly Plant UAW members detailing the effects of the Plant's TRA certification and explaining how the employees should proceed. The Arthur Plaintiffs admit receiving these notices or seeing them on bulletin boards, well before the formal overpayment notices were sent out in early September.

As Arthur Plaintiff Wendell Rose testified, "probably every employee ... realized that they were receiving more than what they should," as a result of the retroactive receipt of TRA. Indeed, combining his SUB benefits and state unemployment benefits (including TRA), Mr. Rose received approximately double the amount that he would have earned had he been working. And, of course, he was not even working for Ford.

Nevertheless, the Arthurs appealed their overpayment determinations to the SUB Joint Board of Administration, arguing that the overpayment calculations were incorrect and that the recoupment efforts themselves were improper. The Joint Board denied the appeal on December 19, 1980. Because the Arthurs failed to repay SUB voluntarily after that decision, Ford began making deductions from future SUB and/or wages as authorized by the Plan. As to those employees who did not return to work and had exhausted all their SUB benefits, Ford really had no effective recourse to recoup SUB overpayments. Indeed, Arthur Plaintiff Patricia Wright has not repaid any of the SUB overpayments she received. The Arthurs then filed a complaint with the Kentucky Labor Cabinet, charging that Ford had unlawfully withheld sums from their paychecks. The Cabinet dismissed the charges and ruled that the deductions were properly made.

From November 16, 1980 until December 29, 1980, workers with less than ten years' service received slightly reduced SUB payments. Full SUB payments were resumed to all eligible employees on December 29, 1980, when the Fund was restored to a healthy level as a result of Ford's increased contributions.

Under the terms of the SUB Plan, an employee trades credit units for SUB benefits. An employee is allotted credit units based on seniority and number of hours worked. While the Delks were prohibited from or restricted in trading credit units for benefits during that five month period from July to December, thereafter they were able to use their credit units to receive benefits.

## II.

The First Issue raised by the Delk Plaintiffs is whether the district court applied the proper standard of care applicable to the fiduciary-employer of an ERISA-governed plan designed to provide benefits to workers laid off by the employer. The Delk Plaintiffs argue that the district court applied the arbitrary and capricious standard but should have applied the prudent person standard; the defendants argue that the district court did apply the prudent person standard.

The question whether the trial court applied the proper standard of review is an issue of law subject to de novo review. *See Complaint of Paducah Towing Co., Inc.*, 692 F.2d 412, 422 (6th Cir.1982).

After reviewing the extensive findings of fact and conclusions of law made by the trial court, this court finds that the district court did apply the proper standard of review. The court noted—and the parties do not dispute—(1) that the plaintiffs' claims under the Labor Management Relations Act were subject to the arbitrary and capricious standard, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), *Stevens v. Employer-Teamsters Joint Council No. 84 Pension Fund*, 979 F.2d 444 (6th Cir.1992); (2) that, under ERISA, where the plan grants discretion in specific terms, the denial of benefits or interpretation of the plan by the trustee or administrator is to be overturned only if it is arbitrary and capricious, *Cairns v. Bridgestone/Firestone, Inc.*, 802 F.Supp. 152 (N.D.Ohio 1992); (3) that claims of wrongful denial of benefits are reviewed under a *de novo* standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); and (4) that, in general, the fiduciary's conduct is measured by the objective, prudent person standard, 29 U.S.C. § 1104(a)(1)(B).

In accordance with the multiple levels of review prescribed by ERISA and the cases interpreting it, the district court applied different standards in analyzing differ-

ent decisions. For example, the court applied the arbitrary and capricious standard to Ford's determination of employees' eligibility to collect SUB benefits, the amount of benefit to which each employee was entitled, the number of credits an employee must surrender to receive a SUB benefit, and whether an overpayment occurred. Findings of Fact and Conclusions of Law, para. 12. It is equally clear that the court applied the prudence standard to the plaintiffs' claims that Ford and the UAW failed to adequately preserve the assets of the SUB Fund. *See* Findings of Fact and Conclusions of Law, para's 22–26, The court stated in this section of its Findings of Fact and Conclusions of Law:

> The Court must evaluate the 'prudence of the fiduciaries under the circumstances prevailing when they make their decision and in light of the alternatives available to them.' *Marshall v. Glass/Metal Ass'n and Glaziers & Glassworkers Pension Plan*, 507 F.Supp. 378, 384 (D.Hawai'i 1980).

Findings of Fact and Conclusions of Law, para. 26. The court added, "A fiduciary's conduct is to be judged according to the standards of others acting in a like capacity and familiar with such matters. *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984)." Findings of Fact and Conclusions of Law, para. 28. This is the objective, prudent person standard which the plaintiffs advocate. After examining all of the plaintiffs' claims, each under its appropriate standard of review, the court concluded: "This Court concludes as a matter of law that Ford's actions were not arbitrary or capricious and that given the information available to Ford during the period in question, Ford acted reasonably and prudently even under a *de novo* standard of review." Findings of Fact and Conclusions of Law, para. 34. The court properly judged each alleged impropriety under the appropriate standard.

### III.

The Delk Plaintiffs' second issue is whether they have standing to recover benefits directly to them, as opposed to the Plan. The trial court bifurcated the liability and damages issues for trial. Because the trial court found no liability—and this court affirms that determination—there is no need to determine whether the individuals have standing to recover benefits directly to them; no benefits are recoverable by either the plaintiffs or the SUB Plan.

### IV.

■ The Arthur Plaintiffs ask this court to find that Ford breached the SUB Plan by failing timely to notify them of overpayments of SUB benefits before it acted to recoup those overpayments.

The SUB Plan permits Ford to recoup overpayments, unless, *inter alia*, "notice has not been given within 120 days from the date the overpayment was established or created, . . ." This is the phrase the court must interpret. There is no dispute that the Arthur class members received overpayments and received notices of overpayment of SUB benefits on or about September 9, 1980. The question is when the 120-day period began to run.

Members of the Arthur class argue that the 120-day period began to run on April 17, 1980, when the Secretary of Labor determined and certified the plant at which they worked as sufficiently affected by foreign trade so as to make the workers eligible for TRA benefits. Ford contends that the relevant date is August 4, 1980, the date determined by the Joint Board of Administration pursuant to the Ryder–Bannon Agreement. The trial court did not pinpoint the date on which the overpayments were established or created but rather concluded that, under any reasonable interpretation, they were not established or created more than 120 days before September 9, 1980.

We conclude that the district court was correct in finding that the notice of overpayment was timely and in rejecting the Arthur Plaintiffs' contention that the trigger date should be April 17, 1980. First, on April 17, 1980, no member of the Arthur class had actually received SUB benefits; the first payment was received on May 14, 1980 by Arthur Plaintiff Patricia Wright. Second, while the April 17, 1980 certification by the

Department of Labor established that some employees would probably receive TRA benefits, it did not establish which ones would receive them or in what amount. The states themselves had not yet made those determinations in April 1980, and Ford could not have been expected to know the amounts of over payments at that time. It is simply not sensible to construe the phrase "established or created" as April 17, 1980—before any Arthur Plaintiff actually received any TRA benefits and before even the state had determined which employees would receive TRA benefits and in what amounts. Furthermore, if the SUB Plan had begun recoupment in April, employees would have had a lapse in benefits. By waiting, the SUB Plan ensured that workers were receiving benefits.

The earliest the overpayments could possibly have been established or created was May 14, 1980, when the first Arthur Plaintiff received the first TRA check. It is equally sensible to place the trigger date at August 4, 1980, the date on which the Plan, as modified by the Ryder–Bannon Agreement, permitted Ford to begin offsetting TRA benefits against SUB benefits. The district court's finding is correct.

The findings of fact and conclusions of law of the district court are affirmed in all respects.